**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF IOWA**
**CEDAR RAPIDS DIVISION**

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>　　　　　　Plaintiff,<br><br>vs.<br><br><br>ROBERT LEE DRAYTON, JR.,<br>　　　　　Defendant. | Case No. 23-cr-25-CJW<br><br><br>**REPORT AND RECOMMENDATION ON DEFENDANT'S MOTION TO SUPPRESS** |

_____

**TABLE OF CONTENTS**

**Page**

I.　　**INTRODUCTION**.................................................................2

II.　　**FINDINGS OF FACT**........................................................4

　　A.　　*Traffic Stop*.........................................................4

　　B.　　*Narcotics Investigation* ..........................................7

III.　　**DISCUSSION**................................................................10

　　A.　　*Parties' Arguments*...............................................10

　　B.　　*Relevant Law* ......................................................12

　　C.　　*Analysis*..............................................................17

　　　　1.　　*Investigatory Stop:　Traffic Violations* ...............................17

　　　　2.　　*Investigatory Stop:　Drug Trafficking Investigation*................28

　　　　3.　　*Attenuation of Defendant's Statements* ...............................32

1

**4.** **Search Warrant for Defendant's Residence**...........................36

      *a.* *Whether the Search Warrant for Defendant's Residence is Supported by Probable Cause After Allegedly Tainted Statements are Excised*.........................................37

      *b.* *Good Faith Exception*...........................................39

**5.** *Summary*....................................................................41

**IV.** **CONCLUSION**................................................................42

## I. INTRODUCTION

On April 5, 2023, the Grand Jury returned an Indictment charging Defendant with one count of Possession with Intent to Distribute a Controlled Substance in violation of 21 U.S.C. Sections 841(a)(1) and 841(b)(1)(A) and one count of Possession of a Firearm in Furtherance of a Drug Trafficking Crime in violation of 18 U.S.C. Section 924(c)(1). (Doc. 3.)

The matter before me is Defendant's motion to suppress. (Doc. 19.) The motion contained an inventory of items to be suppressed which includes: methamphetamine located in a blue duffle bag in the back seat of the vehicle Defendant was driving; field and confirmatory test results regarding the methamphetamine; Defendant's statements to law enforcement during a pat-down search; $3,829 in cash located on Defendant's person; two cell phones taken from Defendant at the time of his arrest; Defendant's statements to officers after a canine sniff of the vehicle; admissions by Defendant as to possession of a firearm; a firearm in the vehicle; Defendant's statements during a February 23, 2023 interview with law enforcement; the request for and results of urine testing on February 23, 2023; the contents of two cellphones searched and seized during the traffic stop; and certain contents of a search warrant application. (Doc. 19-2.) This

evidence was seized during or related to a vehicle stop on February 23, 2023 in Cedar Rapids, Iowa. (Doc. 19-1.)

The Government timely filed a response to the motion. (Doc. 23.) The Honorable C.J. Williams, United States District Court Judge, referred the motion to me for a Report and Recommendation. I held a hearing on Defendant's motion to suppress on September 5, 2023. (Doc. 25.)

At the hearing, the following Government exhibits were admitted without objection:

1. Linn County Search Warrant dated February 23, 2023;

2. Application for Federal Search Warrant dated April 3, 2023;

3. Dashboard camera video from Officer Jenatscheck's patrol vehicle; and

4. Body camera video from Officer Jenatscheck.

The Government called the following witnesses: Cedar Rapids Police Officer Matthew Jenatscheck; Cedar Rapids Police Officer Cody Vry; Cedar Rapids Police Officer Mitchell Magill; and Cedar Rapids Police Investigator and Drug Enforcement Agency Task Force Officer Matthew Cummings. I found the witnesses credible.

At the hearing, the parties were given the opportunity to submit post-hearing supplemental briefs. Defendant timely filed a supplemental brief. (Doc. 26.) The Government timely filed a supplemental brief. (Doc. 27.)

For the following reasons, I respectfully recommend that the District Court **deny** Defendant's Motion to Suppress.

## II. FINDINGS OF FACT

### A. Traffic Stop

On February 23, 2023, Cedar Rapids Police Officer Matthew Jenatscheck came on duty at 4:00 p.m. and was informed of an ongoing investigation involving Defendant.[1] (Jenatscheck Hr'g Test. at 3.) Specifically, Officer Jenatscheck was informed that narcotics investigators had been surveilling Defendant since earlier in the day for a possible drug transaction. (*Id.* at 12.) At around 7:30 p.m., Officer Jenatscheck was in an unmarked patrol car off 51st Street and Council Street in Cedar Rapids. He had been asked to be in that area and knew that other law enforcement officers had followed Defendant to the Marcus Theatres parking lot off Council Street. Officer Jenatscheck heard over the radio that another vehicle had pulled into the Marcus Theatres parking lot and officers observed an individual exit the vehicle with a bag, take it to Defendant's vehicle, and place it in the back seat. (*Id.* at 3-4.)

After Defendant left the theatre parking lot, Officer Jenatscheck followed Defendant onto Interstate 380. While traveling southbound through the I-380 "S" curves, Officer Jenatscheck observed Defendant's vehicle veer to the right and hit the white outermost fog line multiple times. (*Id.* at 4.) Specifically, Officer Jenatscheck observed Defendant touch the white fog line on two occasions and hit the fog line on a third occasion. (*Id.* at 14.) Because Officer Jenatscheck observed Defendant hit or touch the white fog line three times, he conducted a traffic stop on Defendant for safety concerns and to determine whether Defendant was impaired. (*Id.* at 4.) Officer Jenatscheck also noted that, when he turned on his lights, Defendant made a quick move to the next lane

---

[1] Officer Jenatscheck has been a police officer for 27 years and has been employed by the Cedar Rapids Police Department since August 2021. Prior to joining the CRPD, Officer Jenatscheck spent 21 years with the Marion Police Department and 4 years with the Manchester Police Department. He is a graduate of the Iowa Law Enforcement Academy and has had regular training, including narcotics trafficking school while a member of the DEA Drug Task Force.

without using his turn signal, which was another traffic violation. (*Id.* at 5.) Additionally, Officer Jenatscheck testified that another reason he pulled Defendant over had to do with the ongoing narcotics investigation and the possible drug transaction that occurred in the Marcus Theatres parking lot.[2] (*Id.* at 6.)

Defendant exited I-380, turned right onto 33rd Avenue SW, and pulled into a gas station. (Gov. Exhibit 3 at 2:57-3:55.) Officer Jenatscheck exited his patrol car and went to the driver's window of Defendant's vehicle. Defendant handed Officer Jenatscheck his license and Officer Jenatscheck testified that there were no signs of intoxication or impairment (*Id.* at 4:00-4:20; Jenatscheck Hr'g Test. at 5, 15.)

Cedar Rapids Police Officer Cody Vry, a canine officer, was also on the scene for the entirety of the stop. (Jenatscheck Hr'g Test. at 6.) At least two additional officers were also on the scene. Officer Vry led his dog around Defendant's vehicle for an open-air sniff and the dog alerted on the vehicle for drugs. (*Id.* at 6-7.) Officer Jenatscheck testified that the dog sniff occurred before he had completed the traffic stop, noting that on the dashboard camera video, while the dog is conducting the sniff "you can hear a beep, and you can hear me radioing to dispatch [Defendant's] driver's license number to verify if he had a valid license."[3] (*Id.* at 11; Gov. Exhibit 3 at 6:35-6:40.)

---

[2] On cross-examination, Defendant's attorney noted that Officer Jenatscheck's report, which was not introduced into evidence, lacked any information regarding the narcotics investigation involving Defendant. (Jenatscheck's Hr'g Test. at 13.) When asked by the Government on re-direct examination why his report lacked information on the narcotics investigation, Officer Jenatscheck responded, "I was not stopping [Defendant] initially for the narcotics. That was part of it, but I had probable cause for the driving, and that's why I stopped him." (*Id.* at 16.)

[3] In the dashboard camera video, while Officer Jenatscheck radios the dispatcher, Officer Vry and his dog are visible for about five seconds and it appears Officer Vry and his dog may be approaching Defendant's vehicle. The dash camera video does not show the actual dog sniff.

Based on the dog's positive alert, officers searched the vehicle. In the front seat of the vehicle, officers found a handgun that Defendant advised was in the vehicle and that he had a permit to carry it. Officers also found a large blue duffle bag in the back seat which contained multiple packages believed to be narcotics. One of the packages from the bag was opened and field tested positive for methamphetamine. (Jenatscheck Hr'g Test. at 7.)

On February 23, 2023, Officer Vry,[4] the canine officer on the scene at the traffic stop, testified that he was also aware of the narcotics investigation involving Defendant, including the observations of other officers in the Marcus Theatres parking lot.[5] (Vry Hr'g Test. at 19.) Officer Vry stated that he "knew there was a potential for narcotics being involved in [Defendant's] vehicle." (*Id.*) When Officer Jenatscheck stopped Defendant, Officer Vry was immediately on the scene as he had been following Officer Jenatscheck. After Defendant was removed from the vehicle, Officer Vry ran the dog around Defendant's vehicle and the dog alerted on Defendant's vehicle at the B pillar on the driver's side. Officer Vry's dog is trained to detect heroin, methamphetamine, cocaine, and marijuana. (*Id.* at 20-21.)

---

[4] Officer Vry is employed by the Cedar Rapids Police Department and is assigned to the K-9 Unit. He has been a police officer for ten years. Officer Vry's dog is a certified dual purpose narcotics dog, meaning the dog is trained to track and to detect narcotics.

[5] On cross-examination, Defense Counsel noted that, in his report (which was not introduced into evidence), Officer Vry did not include any information regarding his knowledge of the ongoing narcotics investigation involving Defendant on February 23, 2023. (Vry Hr'g Test. at 24-26.) Officer Vry stated that he did not include the information regarding the narcotics investigation because "that's the other officers'[] information. I rely on their reports to dictate what—what they did and what that involvement was" and because "I typically run my dog around traffic stops. The reason for why I run it I leave out of my report." (*Id.* at 25.) Officer Vry also stated on re-direct examination that he left out the narcotics information because he didn't want to speak on other officers' behalf and to help protect the investigation. (*Id.* at 26.)

## B.    *Narcotics Investigation*

On February 16, 2023, Cedar Rapids police officers conducted a traffic stop on an individual who was found with 1.5 pounds of methamphetamine. Cedar Rapids Police Investigator Mitchell Magill[6] interviewed the individual who agreed to cooperate as a confidential informant ("CI") in the hopes of reducing or avoiding charges related to the methamphetamine seized in the traffic stop. Investigator Magill testified that he was unaware of any concerns with the CI's behavior during the narcotics investigation involving Defendant. (Magill Hr'g Test. at 28-29.)

The CI informed Investigator Magill that Defendant was the CI's methamphetamine source. On February 23, 2023, in the early morning, the CI called Investigator Magill and told him that Defendant had received a "load" of drugs and the CI was supposed help Defendant package the narcotics. The CI stayed in contact with Investigator Magill. The CI went to Defendant's house and relayed to Investigator Magill that Defendant had not yet received the drugs. (*Id.* at 30-31.)

At 9:00 a.m., on February 23, 2023, Investigator Magill began surveillance on Defendant's residence. At approximately 1:30 p.m., a vehicle arrived at Defendant's residence. The vehicle had three occupants, two males and a female. Both males went into Defendant's house for approximately nine minutes and then all three occupants left in the vehicle. Later, Defendant and his girlfriend left the residence and drove to 18th Street in Cedar Rapids where he had a short meeting with a male at the car. Investigator Magill testified that he believed he observed a drug transaction between Defendant and the male. (*Id.* at 31-33.)

At approximately 2:23 p.m., law enforcement conducted a traffic stop of Defendant's vehicle. Officers observed a handgun on Defendant's person and found two

---

[6] Investigator Magill has been employed by the Cedar Rapids Police Department since 2008. He currently an investigator with the narcotics unit and has been a narcotics investigator since 2019.

MDMA pills and approximately 8 grams of methamphetamine. Defendant and his girlfriend were allowed to leave, and officers did not seize the firearm. They returned to Defendant's residence. (*Id.* at 33-34.) Later, they again left the residence and drove to the Save A Lot parking lot. Defendant's girlfriend went into the Save A Lot. While Defendant's girlfriend was in the Save A Lot, another woman exited a SUV parked next to Defendant's vehicle and sat in the passenger seat of Defendant's car for a short time. Investigator Magill testified that the actions of the woman in Defendant's passenger seat were consistent with narcotics activity. (*Id.* at 32-33.) When Defendant's girlfriend returned to the car from the Save A Lot, they left the parking lot and drove back to 18th Street, where Investigator Magill observed what he believed was another drug transaction. (*Id.* at 33, 35.) From 18th Street, Defendant and his girlfriend returned to Defendant's residence for a time before leaving again for Crestridge Apartments on Edgewood Road. At the Crestridge Apartments, Defendant's girlfriend exited Defendant's vehicle and entered another vehicle. After dropping off his girlfriend, Defendant drove to the Marcus Theatres. (*Id.* at 36.)

Defendant parked in the Marcus Theatres parking lot and waited for about 20 minutes before a van arrived and parked next to his vehicle. Law enforcement observed a male exit the van. The male walked over to the rear driver's side door of Defendant's vehicle and placed a bag in the back seat. Based on his knowledge and experience, Investigator Magill suspected that a drug transaction had occurred, and Defendant had received the delivery of a load of narcotics the CI had alerted him to earlier in the morning. (*Id.* at 36-37.) Investigator Magill testified that he believed there was both probable cause and reasonable suspicion to believe there were drugs located in Defendant's vehicle and that Defendant had engaged in drug trafficking throughout the day on February 23, 2023. (*Id.* at 40-41.)

On February 23, 2023, prior to the traffic stop, Cedar Rapids Police Investigator Matthew Cummings was involved in surveillance of Defendant and specifically observed what he considered to be a drug transaction at the Save A Lot.[7] (*Id.* at 49.)

Following the traffic stop, Defendant was transported to the Cedar Rapids Police Department. At the police station, at approximately 8:30 p.m. (Investigator Cummings estimated about 30-60 minutes after the traffic stop), Investigator Cummings and Iowa Department of Narcotics Enforcement Special Agent Lupkes interviewed Defendant.[8] Both Investigator Cummings and Special Agent Lupkes were dressed in plain clothes. Defendant was *Mirandized* by Investigator Cummings prior to questioning. The interview took place in an interview room at the Cedar Rapids Police Department. The interview room was locked, and Defendant was not free to leave. Defendant was not handcuffed in the interview room. Defendant admitted going to the Marcus Theatres parking lot to pick up the package. Defendant explained that someone would call him and give him a location to pick up a package, he would hold onto the package until receiving another phone call with a location to meet another person and drop the package off. Defendant admitted that he had done this on four other occasions beginning in

---

[7] Investigator Cummings is employed by the Cedar Rapids Police Department. He is currently assigned to the DEA Drug Task Force. He has been a Task Force Officer for approximately five years and was previously a Task Force Officer in 2012 for approximately 2.5 years.

[8] At the hearing, Investigator Cummings indicated that the custodial interview took place around 9:30 p.m. (Cummings Hr'g Test. at 50.) However, in its brief, the Government states that the interview began at approximately 8:30 p.m. (Doc. 23-1 at 6.) Similarly, in Defendant's supplemental brief, Defendant states that the interview began at 8:30 p.m. (Doc. 26 at 4.) Furthermore, 8:30 p.m. is consistent with Investigator Cummings's testimony that interview occurred about 30-60 minutes after the traffic stop, which commenced around 7:40 p.m. (Cummings Hr'g Test. at 63.) Additionally, at the hearing, the Government gave Investigator Cummings a document, which presumably was the report relating to the custodial interview (the report was not entered into evidence), and according to the document, the interview began at 8:30 p.m. (*Id.* at 66.)

December 2022.  Defendant denied knowing the exact contents of the packages but agreed that they likely contained weapons or drugs.  Defendant was released from the police station, but only after a search warrant for Defendant's residence had been completed.  Prior to the search being completed, Defendant was not free to leave.  (*Id.* at 49-51, 63-66.)

As part of the traffic stop, two cell phones were seized from Defendant.  Defendant confirmed the phones belonged to him and a search warrant was obtained to examine their contents.  Investigator Cummings testified that the communications on both phones were consistent with narcotics trafficking.  Specifically, the communications involved meeting times which matched up with law enforcement's observations during surveillance of Defendant on February 23, 2023.  A sample of  urine was also obtained from Defendant.  The urine sample was sent to a laboratory and returned positive for the use of methamphetamine, MDMA, cocaine, and THC.  (*Id.* at 51-53.)  Investigator Cummings testified that, based on the observations of law enforcement at the Marcus Theatres parking lot, he believed there was both probable cause and reasonable suspicion that there were drugs in Defendant's vehicle.  (*Id.* at 55.)

### III.    DISCUSSION

#### A.    Parties' Arguments

Defendant argues that the traffic stop conducted on his vehicle lacked probable cause because there was no law violation.  (Doc. 19-1 at 7.)  Specifically, Defendant contends that touching the fog line three times along Interstate 380 "is the singular fact towards reasonable suspicion" and that "singular issue is the totality of circumstances and such will not suffice to support the traffic stop."  (*Id.* at 8.)  Defendant also argues that the free air dog sniff was improper.  Defendant asserts that Officer Jenatscheck's sole purpose for the traffic stop was to determine whether Defendant was impaired and "[b]y the time Officer Jenatscheck collected the driver's license of Defendant . . . Officer

Jenatscheck knows and affirmatively states that the Defendant was not intoxicated, impaired or under the influence the moment Officer Jenatscheck leaves the window of [Defendant's v]ehicle." (*Id.*) Defendant maintains that the "purpose or mission of the stop reaches its conclusion and is resolved at that exact point, further detention of the Defendant in order to allow a free air canine sniff is outside the scope of the mission." (*Id.* at 8-9.) Defendant asserts that, absent the illegal traffic stop, law enforcement would not have obtained evidence in the form of Defendant's cell phones, his statements, the firearm, and the drugs. Moreover, Defendant argues the search warrant for Defendant's residence would not have been obtained and all of this evidence must be suppressed. (*Id.* at 9-10.)

The Government argues that the traffic stop was proper based on both reasonable suspicion and probable cause. (Doc. 23-1 at 7.) The Government asserts that law enforcement had reasonable suspicion and probable cause to stop and search Defendant's vehicle because a CI told law enforcement that Defendant was going to receive a large quantity of drugs and law enforcement observed another individual place a bag in the back seat of Defendant's vehicle. (*Id.* at 9.) The Government also argues that the traffic stop was also justified based on two traffic violations committed by Defendant. (*Id.*) The Government asserts that the officers also had probable cause and reasonable suspicion to search Defendant's vehicle prior to the dog sniff based on Defendant's observed drug trafficking activities throughout the day on February 23, 2023. (*Id.* at 10-11.) The Government maintains that the traffic stop was not improperly extended by the dog sniff. (*Id.* at 11.) Specifically, the Government points out that "[t]he investigation had not concluded at the time the dog was used and further supported probable cause to search the vehicle." (*Id.* at 12.) The Government also argues that "[e]ven if the traffic stop is found to be illegal, the statements made at the police station should not be suppressed as they are attenuated." (*Id.*) Similarly, the Government argues that evidence found at

Defendant's residence pursuant to a search warrant should not be suppressed because the "evidence contained in the warrant was sufficient to provide a probable cause finding even without the traffic stop and discovery of methamphetamine in the vehicle." (*Id.* at 13-14.)

**B.    *Relevant Law***

The Fourth Amendment protects "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. Const. amend. IV.    "The Fourth Amendment prohibits unreasonable searches and seizures by the Government, and its protections extend to brief investigatory stops of persons or vehicles that fall short of traditional arrest." *United States v. Arvizu*, 534 U.S. 266, 273 (2002) (citing *United States v. Cortez*, 449 U.S. 411, 417 (1981)); *Terry v. Ohio*, 392 U.S. 1, 9 (1968)) (internal quotations omitted).    Officers may only conduct investigatory stops if they have reasonable suspicion that "criminal activity may be afoot." *Id.* (quoting *United States v. Sokolow,* 490 U.S. 1, 7 (1989)); *United States v. Patrick*, 776 F.3d 951, 954 (8th Cir. 2015).    Reasonable suspicion is based on the totality of the circumstances and requires a "particularized and objective basis" for suspecting legal wrongdoing before a stop can be justified.    *Patrick*, 776 F.3d at 954 (quoting *Cortez,* 449 U.S. at 417); *see also United States v. Brown*, 60 F.4th 1179, 1182 (8th Cir. 2023) ("In analyzing whether an officer had reasonable suspicion, [courts] look to the totality of the circumstances.") (Citing *Kansas v. Glover*, 140 S.Ct. 1183, 1191 (2020)).    "Reasonable suspicion must be supported by more than a mere hunch, but the likelihood of criminal activity need not rise to the level required for probable cause, and it falls considerably short of satisfying the preponderance of the evidence standard." *United States v. Martin*, 15 F.4th 878, 882 (8th Cir. 2021) (quotation omitted); *see also Alabama v. White*, 496 U.S. 325, 330 (1990) ("Reasonable suspicion is a less demanding standard than probable cause not only in the sense that reasonable suspicion can be

established with information that is different in quantity or content than that required to establish probable cause, but also in the sense that reasonable suspicion can arise from information that is less reliable than that required to show probable cause."). "In short, the government must point to specific, articulable facts that reasonably suggest a crime." *United States v. Bustos-Torres*, 396 F.3d 935, 942 (8th Cir. 2005) (citing *Terry*, 392 U.S. at 27).

"In forming a basis for suspicion, officers may draw on their own experience and specialized training to make inferences from and deductions about the cumulative information available to them that might well elude an untrained person." *United States v. Ortiz–Monroy*, 332 F.3d 525, 529 (8th Cir. 2003) (internal quotation marks and citations omitted). Even innocuous actions may give rise to reasonable suspicion under the totality of the circumstances. *United States v. Condelee,* 915 F.2d 1206, 1209 (8th Cir. 1990) (opining that "there could be 'circumstances in which wholly lawful conduct might justify the suspicion that criminal activity was afoot'") (quoting *Reid v. Georgia,* 448 U.S. 438, 441 (1980)). When justifying a particular stop, police officers "must be able to point to specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant that intrusion." *United States v. Navarrete-Barron*, 192 F.3d 786, 790 (8th Cir. 1999) (citations omitted). Moreover, "[t]he 'reasonable suspicion' necessary to justify [a *Terry*] stop 'is dependent upon both the content of information possessed by the police and its degree of reliability.'" *Navarette v. California*, 527 U.S. 393, 397 (2014) (quoting *White*, 496 U.S. at 330).

"A traffic stop constitutes a seizure for purposes of the Fourth Amendment and therefore must be supported by probable cause or reasonable suspicion." *United States v. Givens*, 763 F.3d 987, 989 (8th Cir. 2014) (citing *United States v. Hollins*, 685 F.3d 703, 705-06 (8th Cir. 2012)). A police officer may stop a vehicle only when the officer has "'at least a reasonable, articulable suspicion that criminal activity has occurred or is

13

occurring,' and 'a traffic violation—however minor—creates probable cause to stop the driver of a vehicle.'" *United States v. Cox*, 992 F.3d 706, 709 (8th Cir. 2021) (quoting *United States v. Martin*, 411 F.3d 998, 1000 (8th Cir. 2005)); *see also United States v. $45,000.00 in United States Currency*, 749 F.3d 709, 715 (8th Cir. 2014) ("Any traffic violation, however minor, provides probable cause for a traffic stop.") (Quoting *United States v. Bloomfield*, 40 F.3d 910, 915 (8th Cir. 1994))). Generally, a traffic stop "is reasonable where the police have probable cause to believe that a traffic violation has occurred." *Whren v. United States*, 517 U.S. 806, 810 (1996). A minor traffic violation is sufficient to establish probable cause for an officer to conduct a traffic stop even if the stop is pretext for another investigation. *United States v. Sallis*, 507 F.3d 646, 649 (8th Cir. 2007) (quoting *United States v. Coney*, 456 F.3d 850, 855-56 (8th Cir. 2006)). An officer's actual motivation for making the stop beyond simply issuing a traffic violation is irrelevant provided that the officer has an objectively good reason for making the stop. *Id*.

Warrantless searches are *per se* unreasonable, with a few well-established exceptions. *United States v. Kennedy*, 427 F.3d 1136, 1140 (8th Cir. 2005). However, courts have long recognized the "automobile exception" to the Fourth Amendment. *United States v. Wells*, 347 F.3d 280, 287 (8th Cir. 2003); *see generally Carroll v. United States*, 267 U.S. 132, 158-59 (1925). "The so-called 'automobile exception' permits police to conduct a warrantless search of an automobile if, at the time of the search, they have probable cause to believe that the vehicle contains contraband or other evidence of a crime." *Kennedy*, 427 F.3d at 1140-41 (citations omitted); *see also United States v. Castaneda*, 438 F.3d 891, 893 (8th Cir. 2006) ("The warrantless search of a vehicle is constitutional pursuant to the automobile exception to the warrant requirement, if law enforcement had probable cause to believe the vehicle contained contraband or other evidence before the search began.") (Quotation omitted)). The burden is on the

Government to justify warrantless searches. *Carter v. United States*, 729 F.2d 935, 940 (8th Cir. 1984).

In *Wells*, the Eighth Circuit Court of Appeals articulated probable cause for searching a vehicle during a lawful traffic stop:

> "Probable cause exists when, given the totality of the circumstances, a reasonable person could believe there is a fair probability that contraband or evidence of a crime would be found in a particular place." *United States v. Fladten*, 230 F.3d 1083, 1085 (8th Cir.2000). . . . "If probable cause justifies the search of a lawfully stopped vehicle, it justifies the search of every part of the vehicle and its contents that may conceal the object of the search." *United States v. Ross*, 456 U.S. 798, 825, 102 S.Ct. 2157, 72 L.Ed.2d 572 (1982). "[W]hen police officers have probable cause to believe there is contraband inside an automobile that has been stopped on the road, the officers may conduct a warrantless search of the vehicle, even after it has been impounded and is in police custody." *Michigan v. Thomas*, 458 U.S. 259, 261, 102 S.Ct. 3079, 73 L.Ed.2d 750 (1982) (per curiam).

347 F.3d at 287-88.

"A seizure for a traffic violation justifies a police investigation of that traffic violation." *Rodriguez*, 575 U.S. at 354. The constitutionally acceptable length of the seizure of the individual involved "is determined by the seizure's 'mission.'" *Id.* (citing *Illinois v. Caballes,* 543 U.S. 405, 407 (2005)). Stops may last no longer than necessary to allow officers to achieve their stated purpose. *Id.* (citations omitted); *United States v. Jones*, 269 F.3d 919, 925 (8th Cir. 2001)). "A seizure justified only by a police-observed traffic violation . . . 'becomes unlawful if it is prolonged beyond the time reasonably required to complete the mission' of issuing a ticket for the violation." *Rodriguez*, 575 U.S. at 350-51 (quoting *Caballes*, 543 U.S. at 407) (brackets omitted)). Whether an officer has reasonable suspicion to expand the scope of a stop is determined by looking at "the totality of the circumstances, in light of the officer's experience." *United States v. Carrate*, 122 F.3d 666, 668 (8th Cir. 1997) (citations and quotation marks omitted).

During a traffic stop, an officer may check a driver's license and registration, ask his or her destination and purpose, and ask him or her to step out of the vehicle. *United States v. Linkous,* 285 F.3d 716, 719 (8th Cir. 2002). Moreover, during a traffic stop, an officer "may detain the offending motorist while the officer completes a number of routine but somewhat time-consuming tasks," including a check of the driver's criminal history. *United States v. Quintero-Felix*, 714 F.3d 563, 567 (8th Cir. 2013) (citation omitted); *Jones*, 269 F.3d at 924-25 (listing several tasks officers can legally perform on a traffic stop). While a vehicle is stopped, officers may extend inquiries into matters unrelated to the traffic stop, as long as doing so does not "measurably extend the duration of the stop." *Arizona v. Johnson*, 555 U.S. 323, 333 (2009).

The necessary length of a stop and necessary investigation will vary based on the circumstances of each case. An officer may detain a driver as long as reasonably necessary to conduct these investigative activities and to issue a warning or citation. *Jones,* 269 F.3d at 925 (citing *United States v. Wood,* 106 F.3d 942, 945 (10th Cir. 1997)). If, at any time during a reasonable traffic stop, an officer "develops a reasonable, articulable suspicion that a vehicle is carrying contraband," the officer may expand his intrusion into issues unrelated to any traffic offense. *United States v. Sanchez*, 417 F.3d 971, 975 (8th Cir. 2005) (quotations omitted). A dog sniff of the exterior of a vehicle during a lawful traffic stop does not violate the Fourth Amendment. *United States v. Rivera*, 570 F.3d 1009, 1012 (8th Cir. 2009) (citing *Illinois v. Caballes*, 543 U.S. 405, 409-10 (2005)); *see also United States v. Nguyen*, 59 F.4th 958, 964 (8th Cir. 2023) ("An open air dog sniff that does not prolong the initial purpose of a stop is permissible"); *United States v. Harry*, 930 F.3d 1000, 1005 (8th Cir. 2019) ("[A]s long as a traffic stop is not extended in order for officers to conduct a dog sniff, the dog sniff is lawful") (quoting *United States v. Fuehrer*, 844 F.3d 767, 773 (8th Cir. 2016)). However, a dog sniff cannot unreasonably prolong the stop absent "the necessary reasonable suspicion to

16

justify a further detention or unless the continued encounter is consensual." *United States v. Munoz*, 590 F.3d 916, 921 (8th Cir. 2010) (citations omitted).

## C.    Analysis

### 1.    Investigatory Stop:  Traffic Violations

The parties do not elaborate significantly on this justification for the traffic stop. Defendant's vehicle hit or touched the fog line on three occasions.  This driving behavior may be, in and of itself, a violation of Iowa law, as discussed below, and/or it may be evidence of a different violation, i.e., operating the vehicle while impaired.  Iowa Code Section 321.306, which regulates lane usage on divided highways, provides:

> Whenever any roadway has been divided into three or more clearly marked lanes for traffic the following rules in addition to all others consistent herewith shall apply:
>
> 1.  A vehicle shall be driven as nearly as practical entirely within a single lane and shall not be moved from such lane until the driver has first ascertained that such movement can be made safely.

This provision has become a popular subject for contentious litigation as courts have attempted to determine when a driver's imperfect lane use constitutes probable cause for a stop.

In *State v. Tague*, 676 N.W.2d 197 (Iowa 2004), the Iowa Supreme Court interpreted Section 321.306(1) as follows:

> The plain language of the statute requires that the driver of a vehicle must drive his or her vehicle as much as possible in a single lane, and that the driver cannot move from that lane to the shoulder or to another lane until the operator of the vehicle has ascertained whether he or she can move the vehicle safely.  The dual purpose of the statute is to promote the integrity of the lane markings on the highway and to ensure the safe movement of vehicles on laned roadways.  A violation does not occur unless the driver changes lanes before the driver ascertains that he or she could make such movement with safety.

*Id.* at 203.  In *Tague*, the road in question was a four-lane highway with a painted median dividing the northbound and southbound lanes.  676 N.W.2d at 200.  A police officer observed the defendant's left tires cross over the left edge line of the road and return to the roadway.  *Id.*  The Iowa Supreme Court determined that:

> There was no other traffic on the roadway at the time Tague's vehicle crossed the edge line.  He was not driving his vehicle in an erratic manner, violating any speed restrictions, or weaving his vehicle from side to side on the roadway.  Despite the fact Tague's vehicle just barely crossed the left edge line for a brief period, the State failed to prove by a preponderance of evidence any objective basis to believe Tague's movement was done without first ascertaining that he could make such movement with safety.  Thus, Tague's single incident of crossing the edge line for a brief moment under these circumstances did not give the police probable cause to stop Tague for a traffic violation under section 321.306.[9]

*Id.* at 203-04.

Recently, in an unpublished decision, the Iowa Court of Appeals addressed the issue that, under *Tague*, "'a single, isolated movement over a fog line' does not give rise to a reasonable suspicion for an investigatory stop."  *State v. Murphy*, No. 21-0938, 978 N.W.2d 104 (Table), 2022 WL 1100904, at *1 (Iowa Ct. App. Apr. 13, 2022).  In *Murphy*, on a two-lane divided highway, a sheriff's deputy observed a truck's passenger side tires cross the fog line and enter the shoulder of the road.  2022 WL 1100904, at *1.  Ultimately, by the time the deputy activated his emergency lights, the truck had entered a residential neighborhood and pulled into a driveway.  *Id.*  While talking to the driver of the truck, the deputy noticed signs of intoxication and observed an open beer can in the console of the truck.  *Id.*  The driver failed field sobriety tests and the driver's breath

---

[9] The Iowa Supreme Court concluded that "we do not believe the officer had probable cause to stop Tague's vehicle for a traffic violation under article I, section 8 of the Iowa Constitution."  *Tague*, 676 N.W.2d at 204.

test was over the legal limit. *Id*. The driver was charged with operating while intoxicated. *Id*.

The driver moved to suppress all the evidence derived from the traffic stop, arguing that there was not probable cause or reasonable suspicion to stop him. *Id*. At the state district court suppression hearing:

> when asked by the State to describe what he observed of Murphy's vehicle, the deputy testified: "I noticed that vehicle leave the road with its passenger side tires. . . . He was off on the shoulder, then back on the road. It wasn't sustained." He was unable to estimate how far off the road Murphy's vehicle traveled. But on cross-examination, the deputy said that Murphy's truck "left the road significantly" after crossing the right fog line and that it was "back on the road" in what he described as "a pretty sudden movement." The deputy testified that he initiated the traffic stop because he had previously dealt with impaired or intoxicated drivers, as well as those who had "drifted off the road" due to tiredness or medical issues, so he wanted "to see what this particular issue was."

*Id*. The state district court denied the motion to suppress. *Id*. at *2. The Iowa Court of Appeals reversed the state district court:

> Even if the movement of crossing the fog line itself was arguably more dramatic here than that in *Tague*, the bottom line is that there was no testimony or other evidence presented as to any other factors that would support a reasonable suspicion of Murphy's intoxication beyond that single act. *See* 676 N.W.2d at 205. The *Tague* court made clear that "*an isolated incident* of briefly crossing an edge line of a divided roadway" is insufficient on its own to justify a stop based on the driver's suspected intoxication or fatigue. *Id*. at 205 (emphasis added). In cases in which reasonable suspicion was found in the traffic-stop context, the court in *Tague* specifically noted there was evidence of excessive speeding, swerving, repeated lane crossings, and otherwise erratic driving so as to give rise to a reasonable belief that the driver was impaired. *See id*. Those other factors are not present here. . . .
>
> Based on the totality of the circumstances, we cannot conclude the deputy had reasonable suspicion to stop Murphy's vehicle. Consistent with *Tague*,

and other cases in line with its facts, we do not believe Murphy's one-time act of crossing the fog line with his truck's passenger side tires gave rise to a reasonable suspicion that he was driving while intoxicated. *See, e.g.*, *State v. Lobo*, No. 17-1768, 2019 WL 762192, at *7 (Iowa Ct. App. Feb. 20, 2019) (Tabor, P.J., dissenting) (collecting cases that found no reasonable suspicion for a traffic stop). By focusing only on whether Murphy's truck crossed the fog line "just barely" and for how long, the district court overlooked the important point from *Tague*—that there must be more than a single instance of poor driving so as to distinguish between everyday drivers who make a momentary mistake and those who are reasonably suspected to be driving while impaired. *See* 676 N.W.2d at 205 (recognizing that failure to stay within lane lines "happens all too often" from drivers "talking on their cell phone, looking at a map, adjusting the radio, adjusting the heater, defroster or air condition, or checking on a child restrained in the back seat").

Like Murphy, we find it significant that the State failed to cite a single case from our appellate courts concluding "that a stop of a vehicle was constitutional based upon a single, isolated incident of crossing an edge or fog line." All of the cases upholding investigative traffic stops based on reasonable suspicion involved "more than a person weaving within their own lane or 'briefly crossing an edge line of a divided roadway.'" *See Lobo*, 2019 WL 762192, at *3 (collecting cases finding reasonable suspicion for a traffic stop).

*Id*. at *3-*4.

In another unpublished Iowa Court of Appeals decision involving a traffic stop where the driver was weaving in and out of his lane the appellate court found the stop constitutional under *Tague*. *See State v. Allspach*, No. 15-0552, 882 N.W.2d 875 (Table), 2016 WL 2602655 (Iowa Ct. App. Mar. 9, 2016). In Allspach, the Court of Appeals determined that:

Allspach's weaving was not a single "isolated incident," but a series of incidents within a short time frame. *State v. Tague,* 676 N.W.2d 197, 205 (Iowa 2004). The deputy testified he saw Allspach's truck touch the fog line or the dash line at least five times in less than one and a half minutes. *Cf. id.* (noting Tague's "left tires barely crossed the edge line

once for a very brief period"); *State v. Nguyen,* No. 13–0045, 2013 WL 5498072, at *4 (Iowa Ct.App. Oct. 2, 2013) (noting the absence of "aggravated, continual, or pronounced weaving" within the lane); *State v. Troge,* No. 08–2029, 2009 WL 3064648, at *1 (Iowa Ct.App. Sept. 17, 2009) (noting vehicle "moved slowly near the center median once and moved slowly near the center line once"). In his experience, "with someone driving like that, it's a good possibility they are intoxicated." The district court gave credence to the deputy's testimony. We defer to this credibility finding. *See State v. Pals,* 805 N.W.2d 767, 771 (Iowa 2011).

The deputy's observations were corroborated by a video recording of the encounter taken from the deputy's vehicle. The video captured multiple contacts between the vehicle and the painted lines on either side of the lane. *See State v. Fischels–Wordehoff,* No. 05–0762, 2006 WL 782447, at *2 (Iowa Ct.App. Mar. 29, 2006) (noting videotape showed the "defendant's vehicle drifting from side to side in the lane"). The video also documented the absence of severe weather conditions, roadway obstacles, or other vehicles that might have explained the weaving.

We conclude the deputy "had specific and articulable facts, which taken together with rational inferences from those facts" would have reasonably led him to "believe criminal activity may have occurred." *Tague,* 676 N.W.2d at 204; *State v. Otto,* 566 N.W.2d 509, 511 (Iowa 1997).

*Id.* at *1-*2.

In *United States v. Herrera-Gonzalez*, 474 F.3d 1105 (8th Cir. 2007), the Eighth Circuit Court of Appeals addressed a traffic stop based on Iowa Code Section 321.306. In *Herrera-Gonzalez*, a sheriff's deputy, while traveling on a four-lane interstate highway, observed a vehicle cross the fog line on the right side of the right line for approximately 10 to 15 seconds. *Id.* at 1107. The Eighth Circuit noted that:

Prior to this observation, [the deputy] had not observed any other violations or unusual driving. At the time Herrera-Gonzalez crossed the line, two tow trucks were 50 to 100 yards ahead, partly in the median and partly on the left shoulder of the highway. Nothing was blocking the right shoulder when he crossed the fog line. Prior to reaching the tow trucks, however, Herrera-Gonzalez moved back into the right lane of travel as he approached a short

21

> bridge that was just before the tow trucks. After crossing the bridge, Herrera-Gonzalez "hugged" the fog line until he passed the tow trucks, at which point he resumed travel in the center portion of the right lane.

*Id.* Both because driver crossed the fog line and because he was concerned that the driver might be impaired, the deputy stopped the vehicle. *Id.* The federal district court determined that the stop violated the Fourth Amendment because the deputy "did not have an objectively reasonable basis to believe a traffic violation had occurred." *Id.* at 1108. Specifically, the district court found that "there was 'no factual basis for a conclusion that the Defendant's modest movement from his lane of travel could not be "made with safety"' and that the fog-line crossing could reasonably be interpreted as an attempt to give the tow truck workers more room." *Id.*

The Eighth Circuit reversed the district court, first noting that:

> Federal courts of appeals, including this one, have reached different conclusions on the objective reasonableness of traffic stops based on statutes very similar to § 321.306, depending on the particular circumstances of each case. *Compare United States v. Herrera Martinez,* 354 F.3d 932, 933-34 (8th Cir.2004) (per curiam) (concluding that the officer had probable cause to make a traffic stop where the officer observed no other traffic violations than a single fog-line crossing); *United States v. Pulliam,* 265 F.3d 736, 739 (8th Cir.2001) (concluding that a traffic violation had occurred where the officer observed the driver drift over the fog line twice in two miles); *United States v. Alvarado,* 430 F.3d 1305, 1309 (10th Cir.2005) (holding that an officer had a reasonable, articulable suspicion that the driver had committed a traffic violation where the defendant briefly crossed the fog line once and failed to point to any objective factor that might have interfered with his ability to keep his vehicle in a single lane; noting particularly the absence of any adverse weather or road conditions that would necessitate crossing the line); *United States v. Zabalza,* 346 F.3d 1255, 1258 (10th Cir.2003) (concluding that the officer had "more than the necessary objectively reasonable, articulable suspicion" that the driver had committed a traffic violation where he observed the vehicle cross the center line twice), *with United States v. Gregory,* 79 F.3d 973, 978 (10th Cir.1996) (finding no reasonable

suspicion based on an isolated incident of a vehicle crossing the fog line where the road was winding and mountainous and the weather condition was windy); *United States v. Freeman,* 209 F.3d 464, 466 (6th Cir.2000) (finding no probable cause based on single incident of a large motor home crossing the fog line for a few feet).

*Id*. at 1109-10. The Eighth Circuit also considered *Tague*, noting that the case:

bears some relevance to our objective reasonableness inquiry because a state's judicial interpretation of a state statute can aid in determining whether an officer's actions had some basis in state law. *Cf.* [*United States v.*] *Washington,* 455 F.3d [824,] 828 [(8th Cir. 2006)] (noting that the concept of an objectively reasonable mistake of law cannot be unmoored from actual legal authority; noting the government's failure to provide evidence of, among other things, state case law that would create some objectively reasonable basis for the traffic stop where the statute clearly did not prohibit the conduct the officer thought it did); [*United States v.*] *Martin,* 411 F.3d [998,] 1001 [(8th Cir. 2005)] (noting the lack of evidence in the record of previous judicial interpretations of the statute that might aid in the objective reasonableness inquiry, given the statute's "unusual text"). In *Tague*, the officer observed no suspicious driving other than that the vehicle had "just barely crossed the left line for a brief period." *Tague,* 676 N.W.2d at 204. Given the State's "failure to prove . . . any objective basis to believe Tague's movement was done without first ascertaining that he could make such movement with safety," the court held that the officer did not have probable cause under the Iowa Constitution to stop the driver for a violation of § 321.306. *Id.*

*Id*. at 1110. Further, the Eighth Circuit pointed out that the district court did not:

make factual findings as to whether Herrera-Gonzalez first ascertained that the move could be made with safety or whether the position of the tow trucks in the median and on the left shoulder actually made it impractical for him to stay in the right-hand lane of the interstate. *See* Iowa Code § 321.306 ("A vehicle shall be driven as nearly as practical entirely within a single lane and shall not be moved from such lane until the driver has first ascertained that such movement can be made with safety."). In fact, the suppression hearing transcript reveals that after traveling 10 to 15 seconds straddling the fog line, Herrera-Gonzales crossed back into the right lane in order to cross the bridge before reaching the tow

23

trucks. This at least suggests an objective basis for believing Herrera-Gonzalez did not ascertain that his initial crossing of the fog line could be accomplished safely. Herrera-Gonzalez then remained in the right lane hugging but not crossing the fog line as he passed the tow trucks, which raises the further question of whether it was impractical for him to stay in his lane in the first place. Indeed, [the deputy] testified that the tow trucks' position in the median and on the left shoulder did not make staying in the right lane impractical and that he simply moved his patrol car from the left lane of the interstate to the right lane in order to avoid the tow trucks. Given these differences between the circumstances of this case and those in *Tague*, *Tague's* holding does not compel the conclusion that [the deputy's] belief that Herrera-Gonzalez violated § 321.306 was objectively unreasonable.

*Id*. The Eighth Circuit explained that:

under the circumstances of this stop—the 10 to 15 second crossing of the fog line, the time of day (morning), the clear weather conditions, the fact that there was a full lane of travel between Herrera-Gonzalez and the tow trucks, the lack of any additional adverse conditions that would have made it impractical for Herrera-Gonzalez to keep his car in the lane, and the fact that Herrera-Gonzalez returned to his lane to avoid the bridge and then continued within his lane as he passed the tow trucks—and given the obvious difficulty of observing from a patrol car whether a driver has ascertained that his move can be safely made, we conclude that [the deputy] had an objectively reasonable basis to believe that a violation of the Iowa statute had occurred. *See Alvarado*, 430 F.3d 1305, 1309; *cf. Washington*, 455 F.3d at 828 (noting that where there is a basis in state law for an officer's actions and some ambiguity exists that caused the officer to make the mistake, it may still be objectively reasonable). We recognize that this is a relatively close question, but we believe that based on what he reasonably knew at the time of the stop, [*United States v.*] *Smart*, 393 F.3d [767,] 770 [(8th Cir. 2005)], [the deputy] "could have formed" a reasonable suspicion that Herrera-Gonzales had committed a traffic violation, *Martin*, 411 F.3d at 1001.

*Id*. at 1110-11. Thus, the Eighth Circuit found the stop lawful.

Recently, this Court has found probable cause for a stop where the nature of the alleged violation was somewhat unclear. *United States v. Brown*, No. 23-CR-34-CJW-MAR, 2023 WL 6446200, at *7 (N.D. Iowa Oct. 3, 2023) ("It would be objectively apparent to any officer that by driving in multiple lanes at once without any obstacle that there was a fair probability defendant was in violation of some traffic law, even if the officer was unsure of the exact code provision at the time.")

Here, while traveling on the "S" curves on I-380, Officer Jenatscheck observed Defendant's vehicle "veer" to the right and hit the fog line "a couple different times." (Jenatscheck Hr'g Test. at 4.) Specifically, Officer Jenatscheck observed Defendant's vehicle touch the fog line on two occasions and hit the fog line on another occasion. (*Id.* at 14.) Officer Jenatscheck testified that if a vehicle touches the fog line multiple times, he generally pulls the vehicle over because "it becomes an issue for safety and whether or not the driver is impaired." (*Id.* at 4.) While the traffic violations occurred at night, there is no evidence in the record that there were any obstacles on the roadway which would have caused erratic driving. The dash camera shows no obstacles in the roadway and no weather conditions affecting Defendant's ability to stay in his lane. (Gov. Exhibit 3 at :20-2:47.) Furthermore, I find Officer Jenatscheck's testimony credible. Like *Herrera-Gonzalez*, while this case is also a close call, I find it reasonable that in clear driving conditions, Officer Jenatscheck's observation of Defendant's vehicle touching or hitting the fog line three different times in a short period of time while traveling over a short distance, "could have formed" a reasonable suspicion that Defendant had committed a traffic violation, *see* 474 F.3d at 1111, and Officer Jenatscheck "had specific and articulable facts, which taken together with rational inferences from those facts" would have reasonably led him to "believe criminal activity may have occurred." *Allspach*, 2016 WL 2602655, at *1-*2.

Additionally, when Officer Jenatscheck turned on his emergency lights to pull Defendant's vehicle over, Defendant made a quick move to the next lane without using his turning signal. Iowa Code Section 321.314 provides in pertinent part:

> No person shall turn a vehicle from a direct course upon a highway unless such movement can be made with reasonable safety and then only . . . after giving an appropriate signal . . . in the event any other vehicle may be affected by such movement.

*Id.* Here, the dash camera video shows that Defendant failed to signal when he moved over to the off-ramp when Officer Jenatscheck activated his emergency lights. *See* Gov. Exhibit 3 at 2:50-3:11. Based on the totality of the circumstances, I find that Officer Jenatscheck had probable cause and reasonable suspicion to initiate the traffic stop based on the foregoing traffic violations. *See United States v. Cox*, 992 F.3d 706, 709 (8th Cir. 2021).

The traffic stop was not unconstitutionally prolonged. This case is factually similar to *United States v. Fuehrer*, 844 F.3d 767 (8th Cir. 2016). In *Fuehrer*, the defendant's vehicle was stopped for speeding. *Id.* at 770. The traffic stop involved the following pertinent facts:

> During the traffic stop, [the defendant] was unable to provide a license. Deputy Williams asked [the defendant] to sit in the patrol car while he completed paperwork for the traffic violation. During this time, a second deputy, Deputy Kearney, arrived with a trained narcotics canine. Deputy Kearney conducted an open-air sniff of [the defendant's] vehicle and the canine alerted to the presence of narcotics. After the dog-sniff search was complete, Deputy Williams finished the tasks related to the traffic stop and wrote [the defendant] a warning for the traffic violation. Deputies Williams and Kearney then informed [the defendant] that the canine had alerted to the presence of narcotics, and Deputy Williams gave [the defendant] his *Miranda* warnings. Officers searched the vehicle and found 26.09 grams of methamphetamine.

26

*Id.* at 770-71.  The defendant argued that he was "unconstitutionally detained while officers executed the dog sniff."  *Id.* at 772.  The Eighth Circuit determined that the dog sniff did not unconstitutionally prolong the traffic stop:

> In this case, Deputy Kearney arrived within two minutes of Deputy Williams initiating the traffic stop.  Because [the defendant] did not have a license, Deputy Williams asked [the defendant] to sit in the patrol car while he completed paperwork.  Deputy Kearney conducted the dog sniff while [the defendant] was in the patrol car.  Deputy Williams completed the tasks related to the traffic stop and wrote [the defendant] a warning after the dog sniff was complete and the dog had alerted to the presence of narcotics.  Thus, there is no evidence that the dog sniff unlawfully prolonged the traffic stop beyond what was necessary to complete the stop.

*Id.* at 773.

Here, Officer Vry was following Officer Jenatscheck, and was immediately on the scene when Defendant's vehicle was pulled over.  Officer Jenatscheck testified that the traffic stop was not complete when Officer Vry performed a free air dog sniff with his canine around Defendant's car.  (Jenatscheck Hr'g Test. At 11.)  Officer Jenatscheck noted that on the dash camera video, while Officer Vry and his canine are approaching Defendant's car to perform the free air dog sniff, "you can hear a beep, and you can hear me radioing to dispatch [Defendant's] driver's license number to verify if he had a valid license."  (*Id.*; Gov. Exhibit 3 at 6:35-6:40.)  Even though Officer Jenatscheck determined that Defendant was not impaired after first speaking with him, he could still check Defendant's driver's license and registration, ask him his destination and purpose, and ask him to step out of the vehicle.  *See Linkous,* 285 F.3d at 719.  Thus, based on the foregoing, I find that neither Officer Jenatscheck's performance of a records check on Defendant's identification nor Officer Vry's dog sniff unnecessarily prolonged the traffic stop.  *See Quintero-Felix*, 714 F.3d at 567 (providing that during a traffic stop, an officer "may detain the offending motorist while the officer completes a number of

routine but somewhat time-consuming tasks"); *Fuehrer*, 844 F.3d at 773. Further, because the dog sniff did not prolong the stop and Officer Vry's dog alerted on Defendant's vehicle for narcotics, law enforcement had probable cause to search the vehicle.[10]

### 2. Investigatory Stop: Drug Trafficking Investigation

Should the District Court determine that law enforcement lacked probable cause or reasonable suspicion to conduct the stop on Defendant's vehicle based upon the traffic violations, it should nevertheless conclude that law enforcement had probable cause and reasonable suspicion to conduct an investigatory stop based on Defendant's drug trafficking activities on February 23, 2023. In *United States v. Navarrete-Barron*, 192 F.3d 786 (8th Cir. 1999), police officers arrested an individual, Jaime Garcia, for driving under the influence. *Id.* at 789. Officers searched Garcia's vehicle and found 14 ounces of crack cocaine, $37,000 in cash, ammunition for a handgun, and a room key for a local motel. *Id.* Garcia told the officers that the vehicle belonged to his friend, the defendant, with whom he was staying at the motel. *Id.* Officers immediately began surveillance on the motel room and observed the defendant in the room. *Id.* Officers observed a pickup truck arrive at the motel, the driver of the truck entered the defendant's room and made a quick phone call. *Id.* The defendant and the driver exited the room with a duffel bag and drove off in the truck. *Id.* About one-half mile later, two officers stopped the truck. *Id.* Based on the foregoing facts, the Eighth Circuit determined that:

> the officers made a valid *Terry* stop of the truck and later had probable cause to arrest [the defendant]. First, the initial stop was supported by reasonable and articulable suspicion of criminal activity. Earlier that morning, officers had discovered a large amount of cocaine base along with $37,000 and firearm ammunition. This discovery provided direct and

---

[10] Officer Vry's dog is trained to detect heroin, methamphetamine, cocaine, and marijuana. (Vry Hr'g Test. at 20-21.) Officer Vry's dog was also certified in September 2022 and the dog's certification continued through February 2023, at the time of the traffic stop. (*Id.* at 21.)

substantial evidence of Garcia's involvement in drug trafficking activity. Garcia's statements to the police about [the defendant] back at the motel who had recently purchased the vehicle coupled with a key to the motel room provided enough evidence to support and inference that others were engaged in drug trafficking. Police officers later corroborated Garcia's statements during their surveillance of the motel room. In sum, the officers had a reasonable and articulable suspicion sufficient to make a valid *Terry* stop of the truck in which [the defendant] was a passenger.

*Id*. at 790-91.

Like in *Navarrete-Barron*, I find that law enforcement's actions in this case constituted an investigatory *Terry* stop on Defendant. Here, a CI informed law enforcement that Defendant was the CI's source for methamphetamine. On February 23, 2023, in the early morning hours, the CI informed law enforcement that Defendant had received or would be receiving a supply of drugs that the CI was supposed to help package. The CI went to Defendant's residence and then informed law enforcement that Defendant had not yet received the drugs.

Law enforcement began surveilling Defendant's residence at approximately 9:00 a.m. That afternoon, law enforcement followed Defendant to 18th Street and observed what Investigator Magill believed to be a drug transaction. (Magill Hr'g Test. at 31-33.) At approximately 2:23 p.m., law enforcement conducted a traffic stop of Defendant's vehicle. Law enforcement found two MDMA pills and approximately 8 grams of methamphetamine. Defendant was allowed to leave, and he returned to his residence. Later that afternoon, Defendant, again, left his residence for the Save A Lot, and law enforcement observed another drug transaction in the parking lot of the Save A Lot. (*Id*. at 32-33.) After leaving the Save A Lot, another drug transaction was observed at the same location on 18th Street. Defendant returned to his residence before leaving again for the Marcus Theatres parking lot. At the Marcus Theatres parking lot, law enforcement observed a van park next to Defendant's vehicle, a male exit the van carrying

29

a bag, the male walk to Defendant's rear driver's side door, and the male place the bag in the back seat. Investigator Magill testified that he believed a drug transaction had occurred and Defendant had received the delivery of the narcotics the CI alerted law enforcement would be happening that day. (*Id.* at 36-37.)

Officer Jenatscheck testified that, on February 23, 2023, when he came on duty at 4:00 p.m., he was informed of the ongoing drug investigation involving Defendant and that Defendant had been under surveillance throughout the day. (Jenatscheck Hr'g Test. at 12.) Officer Jenatscheck also testified that he knew about the observations made by officers at the Marcus Theatres parking lot, where a bag believed to contain narcotics was placed in Defendant's car. (*Id.* at 3-4.) Officer Vry also testified that, on February 23, 2023, he was aware of the narcotics investigation involving Defendant, including the placement of a bag in the back seat of Defendant's vehicle in the Marcus Theatres parking lot. (Vry Hr'g Test. at 19.) Investigator Magill testified that he believed there was both probable cause and reasonable suspicion to believe there were drugs located in Defendant's vehicle and that Defendant had engaged in drug trafficking throughout the day on February 23, 2023. (*Id.* at 40-41.) Investigator Cummings testified that, based on the observations of officers at the Marcus Theatres parking lot, he believed that there was probable cause and reasonable suspicion to believe there were drugs located in Defendant's vehicle. (Cummings Hr'g Test. at 55.)

Based on the totality of the circumstances, I find that law enforcement had probable cause and reasonable suspicion to conduct an investigatory *Terry* stop consistent with *Navarrete-Barron*. *See also United States v. Bustos-Torres*, 396 F.3d 935, 942 (8th Cir. 2005) (finding an investigative *Terry* stop constitutional and justified when an officer observed behavior consistent with a drug transaction in an area known to law enforcement to be a common place for drug dealing); *United States v. Williams*, 139 F.3d 628, 630 (8th Cir. 1998) (finding an investigative *Terry* stop constitutional and justified when an

officer observed an individual suspected of drug trafficking in the past engaging in behavior consistent with an illegal drug transaction outside a tavern).

To the extent that Defendant complains that neither Officer Jenatscheck nor Officer Vry included information in their reports regarding the drug investigation involving Defendant on February 23, 2023, such concern is misplaced. Officer Jenatscheck explained that he did not include information regarding the narcotics investigation of Defendant because, as a patrol officer, his primary reason for stopping Defendant was the traffic violations. Officer Jenatscheck stated, "I had probable cause for the driving, and that's why I stopped him." (Jenatscheck Hr'g Test. at 16.) Similarly, Officer Vry explained that he did not include the information regarding the narcotics investigation of Defendant because "that's the other officers'[] information. I rely on their reports to dictate what—what they did and what that involvement was" and because "I typically run my dog around traffic stops. The reason for why I run it I leave out of my report." (Vry Hr'g Test. at 25.) Officer Vry also stated that he left out the narcotics information because he did not want to speak on other officers' behalf and to help protect the investigation. (*Id.* at 26.)

Moreover, the collective knowledge doctrine is applicable to Officer Jenatscheck's and Officer Vry's probable cause and reasonable suspicion to conduct a *Terry* stop and search Defendant's vehicle based on the drug trafficking investigation involving Defendant on February 23, 2023. The collective knowledge doctrine provides that "probable cause may be based on the collective knowledge of all law enforcement officers involved in an investigation and need not be based solely upon the information within the knowledge of the officer on the scene if there is some degree of communication." *United States v. Edwards*, 891 F.3d 708, 711-12 (8th Cir. 2018) (quoting *United States v. Horne*, 4 F.3d 579, 585 (8th Cir. 1993)). Here it is undisputed that Officers Jenatscheck and Officer Vry had knowledge of the drug investigation and that there was communication

31

between narcotics investigators and Officers Jenatscheck and Vry. Accordingly, the information communicated to Officers Jenatscheck and Vry regarding the narcotics investigation of Defendant gave them probable cause and reasonable suspicion which justified the investigatory *Terry* stop and search of Defendant's vehicle.

### 3.     Attenuation of Defendant's Statements

Although I found the traffic stop constitutional, if the District Court were to disagree with me, Defendant's statements following the stop at the police station may have to be suppressed. Therefore, I will also address whether Defendant's statements following the stop at the police station must be suppressed if the District Court finds the stop unconstitutional.

Evidence obtained as a result of an unconstitutional search or seizure must be suppressed as well as any evidence later discovered to be an illegal "fruit of the poisonous tree." *Segura v. United States*, 468 U.S. 796, 804 (1984) (citing *Wong Sun*, 371 U.S. at 484). "Any evidence secured through an unreasonable, hence illegal, search and seizure may not be used in a federal prosecution, nor may the fruit of such tainted evidence be admitted against the defendant whose privacy rights were originally violated." *United States v. Conner*, 948 F. Supp. 821, 829 (N.D. Iowa 1996) (citing *Weeks v. United States*, 232 U.S. 383 (1914); *Wong Sun*, 371 U.S. at 484-88). However, the evidence must be suppressed only if the "illegality is at least a but-for cause of obtaining the evidence." *United States v. Riesselman*, 646 F.3d 1072, 1079 (8th Cir. 2011) (quoting *United States v. Olivera-Mendez*, 484 U.S. 505, 511 (8th Cir. 2007)).

Statements that are sufficiently attenuated from the original taint need not be suppressed. *See id.* at 1080. In *Riesselman*, a defendant's Fourth Amendment rights were violated when officers searched his person while conducting a search of his home pursuant to a valid search warrant that did not authorize searches of persons. *Id.* at 1075. The officers found contraband on the defendant's person. The defendant was given a

*Miranda* warning and said he would speak to officers and made incriminating statements. *Id*. The defendant sought to suppress the statements he made as fruits of the poisonous tree. *Id*. at 1079. The prosecution conceded that the original search of the defendant violated his right to be free from unreasonable searches and seizures. *Id*. The Eighth Circuit affirmed the district court's holding that the defendant offered "no convincing evidence to show he was influenced by the finding of drugs on his person to make incriminating statements to the officers." *Id*. *Riesselman* reasoned that the defendant freely spoke with the officer about legal issues beyond the contraband that was found on his person. *Id*. at 1079-80. Based on this evidence, the court held that the defendant "failed the but-for test because he did not provide sufficient evidence to prove a nexus between the illegal search of his person and his statements made to the officers" and affirmed the district court's decision. *Id*. at 1080.

The first issue is whether there was a sufficient factual nexus between the constitutional violation and the challenged evidence. *See United States v. Yorgensen*, 845 F.3d 908, 913 (8th Cir. 2017) (citation omitted). The alleged constitutional violation here was the traffic stop conducted by Officer Jenatscheck, which constitutes a seizure under the Fourth Amendment. *Givens*, 763 F.3d at 989.

I find that the traffic stop here was the but-for cause of Defendant's statements, and that there was a sufficient factual nexus between the alleged Fourth Amendment violation and Defendant's statements. But for Officer Jenatscheck initiating the traffic stop, Defendant would not have been in a position to speak with Investigator Cummings and Special Agent Lupkes at all. Even though I find that the traffic stop was the but-for cause of Defendant's statements, I will continue to the second part of the analysis because Defendant's statements may not be suppressed if they were sufficiently attenuated from the traffic stop.

33

"The second question is whether the attenuation doctrine applies." *Yorgensen*, 845 F.3d at 914. Evidence is admissible when the connection between the constitutional violation and the evidence is "remote or has been interrupted by some intervening circumstance." *Id.* (citing *Utah v. Strieff*, 579 U.S. 232, 238, 136 S. Ct. 2056, 2061, (2016)). To show that statements after an illegal search or seizure were voluntary to purge the taint, courts consider (1) whether *Miranda* warnings were given, (2) the "temporal proximity" between the constitutional violation and the statements, (3) intervening circumstances, and (4) the "'purpose and flagrancy of the official misconduct.'" *Riesselman*, 646 F.3d at 1080 (quoting *United States v. Lakoskey*, 462 F.3d 965, 975 (8th Cir. 2006)). *Riesselman* held that even if the district court had erred in finding no nexus between the Fourth Amendment violation and the defendant's later statements, it would have still affirmed because the government also showed that the statements were sufficiently attenuated from the constitutional violation that they were voluntary. *See id.* at 1081.

Defendant moves to suppress his statements made during the traffic stop and during his custodial interview at the police station.[11] (Doc. 19-2.) The Government argues that even if the traffic stop was unlawful, Defendant's statements during the custodial interview at the police station should not be suppressed because they are attenuated. (Doc. 27 at 2.)

Turning to the first *Reisselman* factor, the record indicates that Defendant was *Mirandized* by Investigator Cummings prior to the interview. (Cummings Hr'g Test. at 50, 65.) Defendant has asserted no argument that the *Miranda* warning was inadequate. Therefore, this factor weighs in favor of attenuation.

---

[11] Defendant and the Government focus their arguments solely on the statements made at the police station after the traffic stop. (Doc. 19-1 at 9; Doc. 23-1 at 12-13; Doc. 26 at 3-6; Doc. 27 at 2-5.)

When addressing the second *Reisselman* factor, temporal proximity, a short time between the constitutional violation and the statement may be enough to indicate that the statement was voluntary if other circumstances indicate the statement was "sufficiently an act of free will to purge the primary taint." *United States v. Palacios-Suarez*, 149 F.3d 770, 772-73 (8th Cir. 1998) (holding that consent was sufficiently an act of free will to purge the taint of the initial stop where the officer asked the defendant several times if he could search the vehicle nine minutes after the initial stop) (quotation omitted); *Herrera-Gonzalez*, 474 F.3d at 1112 (assuming defendant's consent was given only ten minutes after illegal stop does not "compel the conclusion that the consent was insufficient to purge the taint" without analyzing other factors).

On this factor, the court analyzes whether the statements were made "immediately on the heels" of a constitutional violation, *see United States v. Lakoskey*, 462 F.3d 965, 975 (8th Cir. 2006), *as amended on reh'g* (Oct. 31, 2006) (quoting *United States v. Duchi*, 906 F.3d 1278, 1285 (8th Cir. 1990)), or whether the defendant had time to pause "to contemplate his situation and reconsider his decision to [provide incriminating statements.]" *United States v. Hernandez-Hernandez*, 384 F.3d 562, 565 (8th Cir. 2004); *Yorgensen,* 845 F.3d at 914 (citing *Hernandez-Hernandez*, 384 F.3d at 565). Approximately 30 to 60 minutes passed between the traffic stop and Investigator Cummings's and Special Agent Lupkes's custodial interview of Defendant at the police station. During that time, Defendant had time to pause "to contemplate his situation and reconsider his decision to [provide incriminating statements.]" *Hernandez-Hernandez*, 384 F.3d at 565. Defendant's statements were also not made "immediately on the heels" of the alleged constitutional violation. *See Lakoskey*, 462 F.3d at 975. This factor weighs in favor of attenuation.

In considering the third *Reisselman* factor, a change of location or questioning by a different person from the one who committed the constitutional violation constitute

intervening circumstances. *Hernandez-Hernandez*, 384 F.3d at 566; *Yorgensen,* 845 F.3d at 914 (citing *Hernandez-Hernandez*, 384 F.3d at 566); *see also Riesselman,* 645 F.3d at 1080 (providing that a change in location can be an intervening circumstance that can make it more probable that statements are the product of free will). Here, Defendant was transported to the police station and interviewed by two plain-clothed narcotics investigators not directly involved in the traffic stop. This factor weighs in favor of attenuation.

Finally, the purpose of Officer Jenatscheck's conduct was to stop Defendant's vehicle because he reasonably believed that the vehicle contained drugs and Defendant was potentially impaired and had committed traffic violations. Officer Jenatscheck operated under a reasonable belief that his actions were within his duties as a police officer. This was not flagrant behavior nor official misconduct. This factor weighs in favor of attenuation.

Because all four factors weigh in favor of attenuation, I find that the statements Defendant made during his interview at the police station are attenuated from the original alleged constitutional violation. Accordingly, if the District Court finds that the traffic stop was unconstitutional and the "but-for" cause of Defendant's statements, the statements Defendant made during his custodial interview at the police station should not be suppressed because they were attenuated.

### 4. *Search Warrant for Defendant's Residence*

The Government argues that even if the traffic stop was unconstitutional, the search warrant for Defendant's residence would nevertheless be valid. (Doc. 23-1 at 13.) The Government asserts that the following evidence outside the evidence seized during the traffic stop would support the search warrant:

> Defendant was a known large scale drug trafficker that made what appeared to be multiple drug transactions, had been found earlier in the day with

36

drugs and a gun, was observed receiving a bag from another vehicle, and [D]efendant was previously involved with drugs.

(*Id.* at 14.)  The Government also asserts that the *Leon* good faith exception is applicable. Defendant contends that, if the traffic stop was unconstitutional, any evidence found during the search of Defendant's residence is fruit of the poisonous tree.  (Doc. 19-1 at 9-10.)  Defendant also asserts that the *Leon* good faith exception is not applicable.  (*Id.* at 10.)

> ### a. Whether the Search Warrant for Defendant's Residence is Supported by Probable Cause After Allegedly Tainted Statements are Excised

"The exclusionary rule 'reaches not only primary evidence obtained as a direct result of an illegal search or seizure . . . but also evidence later discovered and found to be derivative of an illegality or fruit of the poisonous tree.'"  *United States v. Swope*, 542 F.3d 609, 613 (8th Cir. 2008) (quoting *Segura v. United States*, 468 U.S. 796, 804 (1984)).  "The sufficiency of a warrant affidavit which contains information from an unlawful search is evaluated after deleting that information."  *United States v. Davis*, 760 F.3d 901, 903 (8th Cir. 2014) (citing *United States v. Hernandez Leon*, 379 F.3d 1024, 1027 (8th Cir. 2004)).  Specifically, "when faced with a warrant containing information obtained pursuant to an illegal search, a reviewing court must excise the offending information and evaluate whether what remains is sufficient to establish probable cause." *United States v. Dessesaure*, 429 F.3d 359, 367 (1st Cir. 2005).

The Government maintains that, even if the evidence seized during the traffic stop was excluded, probable cause would exist for the search warrant for Defendant's residence.  (Doc. 23-1 at 13-14.)  Evidence acquired through a source independent of the taint of a constitutional violation is admissible.  *Wong Sun v. United States*, 371 U.S. 471, 487 (1963).

37

A warrant obtained after an illegal search is not an independent source if either of the following are true: "if the agents' decision to seek the warrant was prompted by what they had seen during the [unconstitutional] entry," and "if information obtained during that entry was presented to the Magistrate and affected his decision to issue the warrant."

*United States v. Swope*, 542 F.3d 609, 613 (8th Cir. 2008) (quoting *Murray v. United States*, 487 U.S. 533, 542 (1988). In other words, two questions "must be answered in the affirmative for the warrant to be an independent source: first, would the police have applied for the warrant had they not acquired the tainted information; and second, do the application affidavits support probable cause after the tainted information has been redacted from them." *Id.* at 613-14. Further, under the first question, the proper test is "whether the police would have applied for the warrant had they not made the prior illegal observations." *Id.* at 615. If removing the tainted information from the warrant removes the basis for probable cause, anything seized in the search based on the warrant must be suppressed. *Murray*, 487 U.S. at 542. However, if the warrant with the information redacted still contains probable cause, any search based on the warrant was valid, barring other constitutional violations or deficiencies. *Swope*, 542 F.3d at 616-17 (finding application supported probable cause when reading the untainted portions of the warrant at issue).

Here, based on the search warrant application, both questions can be answered in the affirmative. Removing the items seized during the traffic stop, in particular the bag of methamphetamine, the search warrant application provided the following information: (1) Defendant was identified by a CI as a source for methamphetamine, cocaine, and ecstasy in Cedar Rapids; (2) the CI identified Defendant's residence and informed law enforcement that the residence contained numerous guns, multiple safes, and narcotics; (3) on February 23, 2023, the CI informed Investigator Magill that Defendant would be receiving approximately 25 pounds of methamphetamine that day; (4) while surveilling

38

Defendant, law enforcement observed Defendant leave his residence and drive to 18th Street in Cedar Rapids and engage in what appeared to be a drug transaction; (5) following the apparent drug transaction, law enforcement conducted a traffic stop (not the stop Defendant is trying to suppress in the instant motion, which occurred late on February 23, 2023) and found two MDMA pills and 8.7 grams of methamphetamine (Defendant was released after this stop); (6) Defendant returned to his residence and later left again where law enforcement observed drug transactions at a Save A Lot and on 18th Street; (7) law enforcement observed Defendant at the Marcus Theatres parking lot, where an individual exited a van and placed a bag in the back seat of Defendant's vehicle; and (8) Defendant's criminal history included previous drug related convictions. (Gov. Exhibit 1 at 10-11.) Based on the foregoing, I find that the police would have applied for the warrant without the information from the traffic stop. *See Swope*, 542 F.3d at 613-615. Further, I find that the search warrant, even without the information from the traffic stop, still contains probable cause to believe the residence may contain evidence associated with drug trafficking, which was the subject of the warrant. *See Swope*, 542 F.3d at 616-17.

### b. *Good Faith Exception*

The Government also argues that because the search warrant for Defendant's residence contains probable cause absent any information from the traffic stop a warrant would issue and that the *Leon* good faith exception would apply. (Doc. 23-1 at 13-14.) Defendant argues that law enforcement engaged in illicit and clearly illegal activity and that the *Leon* exception cannot be applied. (Doc. 19-1 at 10.)

Under the good faith exception articulated in *United States v. Leon*, even if a reviewing court determines substantial evidence to issue a warrant is absent, the court should not suppress evidence seized pursuant to the search warrant if the officers executing the search warrant acted in objectively reasonable reliance on the issuance of

the warrant by a neutral magistrate or judge. 468 U.S. 897, 922 (1984); *United States v. Houston*, 665 F.3d 991, 994-95 (8th Cir. 2012). "In making this determination, we ask 'whether a reasonably well-trained officer would have known that the search was illegal despite a judge's issuance of the warrant.'" *United States v. Lopez-Zuniga*, 909 F.3d 906, 909 (8th Cir. 2018) (quoting *United States v. Jackson*, 784 F.3d 1227, 1231 (8th Cir. 2015)).

Under the "good-faith exception," if a law enforcement officer's reliance on a warrant was objectively reasonable, the evidence seized pursuant to an invalid warrant will not be suppressed. *United States v. Proell*, 485 F.3d 427, 430 (8th Cir. 2007). *Proell* noted that *Leon* identified four scenarios where it is not objectively reasonable for the executing officer to rely on a warrant issued by a magistrate:

> (1) when the affidavit or testimony supporting the warrant contained a false statement made knowingly and intentionally or with reckless disregard for its truth, thus misleading the issuing judge; (2) when the issuing judge "wholly abandoned his judicial role" in issuing the warrant; (3) when the affidavit in support of the warrant is "so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable"; and (4) when the warrant is "so facially deficient" that no police officer could reasonably presume the warrant to be valid.

*Id*. at 431 (citing *Leon*, 468 U.S. at 923; *United States v. Puckett*, 466 F.3d 626, 630 (8th Cir. 2006)).

*Leon* explained that "[s]earches pursuant to a warrant will rarely require any deep inquiry into reasonableness, for a warrant issued by a judge normally suffices to establish that a law enforcement officer has acted in good faith in conducting the search." 468 U.S. at 922 (quotations omitted). Nevertheless, "in some circumstances the officer will have no reasonable grounds for believing that the warrant was properly issued." *Id*. at 922-23 (footnote omitted). "For the *Leon* exception to apply when the warrant is based on evidence obtained through a Fourth Amendment violation, [law enforcement's]

prewarrant conduct must have been 'close enough to the line of validity to make the officers' belief in the validity of the warrant objectively reasonable.'" *United States v. Cannon*, 703 F.3d 407, 413 (8th Cir. 2013) (quoting *United States v. Conner*, 127 F.3d 663, 667 (8th Cir. 1997)). If the prewarrant conduct is clearly illegal, however, the exception does not apply. *Cannon*, 127 F.3d at 413.

None of the four scenarios imagined by *Leon* apply here. Defendant instead appears to argue that law enforcement's actions were clearly illegal because law enforcement lacked probable cause to conduct the traffic stop on Defendant. (Doc. 19-1 at 10.) As discussed above, I find that law enforcement had probable cause to conduct the traffic stop. Nothing on this record shows that any of law enforcement's conduct related to the traffic stop was "clearly illegal." Instead, the record shows that law enforcement's actions conducting the traffic stop and the search of Defendant's vehicle never strayed from, or far from, the line of validity. *See Cannon*, 127 F.3d at 413. Thus, I find that law enforcement's conduct was close enough to the line of validity to justify law enforcement's belief that the search warrant was objectively reasonable. *See id*.

### 5. *Summary*

I find that Officer Jenatscheck had probable cause and reasonable suspicion to initiate the traffic stop based on traffic violations—Iowa Code Sections 321.306(1) and 321.314. Further, following the stop, I find that because the dog sniff did not prolong the stop and Officer Vry's dog alerted on Defendant's vehicle for narcotics, law enforcement had probable cause to search the vehicle. In the event that the District Court determines that law enforcement lacked probable cause or reasonable suspicion to conduct the traffic stop on Defendant's vehicle based upon the traffic violations, law enforcement also had probable cause and reasonable suspicion to conduct an investigatory stop of

Defendant's vehicle based on Defendant's drug trafficking activities on February 23, 2023. Thus, I recommend that Defendant's motion to suppress should be denied.

If the District Court finds that the traffic stop was unconstitutional and the "but-for" cause of Defendant's statements, the statements Defendant made during his custodial interview at the police station should not be suppressed because they were attenuated. I also find that the search warrant for Defendant's residence, even without the information from the traffic stop, still contained probable cause to believe the residence may contain evidence associated with drug trafficking, which was the subject of the warrant and the evidence found in the residence should not be suppressed. Finally, I find that under the *Leon* good faith exception, law enforcement's conduct was close enough to the line of validity to justify law enforcement's belief that the search warrant for Defendant's residence was objectively reasonable and evidence found in Defendant's residence should not be suppressed.

## IV. CONCLUSION

For the reasons set forth above, I respectfully recommend the District Court **deny** Defendant's Motion to Suppress. **(Doc. 19.)**

Objections to this Report and Recommendation in accordance with 28 U.S.C. Section 636(b)(l) and Fed. R. Crim. P. 59(b) must be filed within fourteen (14) days of the service of a copy of this Report and Recommendation. Objections must specify the parts of the Report and Recommendation to which objections are made, as well as the parts of the record forming the basis for the objections. *See* Fed. R. Crim. P. 59. Failure to object to the Report and Recommendation waives the right to *de novo* review by the district court of any portion of the Report and Recommendation as well as the right to

appeal from the findings of fact contained therein. *United States v. Wise,* 588 F.3d 531, 537 n.5 (8th Cir. 2009).

      **DONE AND ENTERED** at Cedar Rapids, Iowa, this 10th day of October, 2023.

Mark A. Roberts, United States Magistrate Judge
Northern District of Iowa