# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF IOWA
# CEDAR RAPIDS DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, | No. 23-CR-25-CJW-MAR |
| Plaintiff, | **ORDER** |
| vs. | |
| ROBERT LEE DRAYTON, JR., | |
| Defendant. | |

## I. INTRODUCTION

This matter is before the Court on defendant's Motion to Suppress. (Doc. 19). The government filed a timely resistance. (Doc. 23). The Court referred defendant's motion to the Honorable Mark A. Roberts, United States Magistrate Judge, for a Report and Recommendation ("R&R"). On September 5, 2023, Judge Roberts held a hearing on the motion to suppress and ordered supplemental briefing. (Doc. 25). Then, on October 10, 2023, Judge Roberts recommended the Court deny defendant's motion to suppress. (Doc. 30). Neither the government nor defendant objected to Judge Roberts' R&R. For the following reasons, the Court **adopts** Judge Roberts' R&R, and **denies** defendant's Motion to Suppress.

## II. STANDARD OF REVIEW

The Court reviews Judge Roberts' R&R under the statutory standards found in Title 28, United States Code, Section 636(b)(1):

> A judge of the court shall make a de novo determination of those portions of the report or specified proposed findings or recommendations to which objection is made. A judge of the court may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate

judge. The judge may also receive further evidence or recommit the matter to the magistrate judge with instructions.

*See also* FED. R. CIV. P. 72(b) (stating identical requirements). While examining these statutory standards, the United States Supreme Court explained:

> Any party that desires plenary consideration by the Article III judge of any issue need only ask. Moreover, while the statute does not require the judge to review an issue de novo if no objections are filed, it does not preclude further review by the district judge, sua sponte or at the request of a party, under a de novo or any other standard.

*Thomas v. Arn*, 474 U.S. 140, 154 (1985). Thus, a district court may review de novo any issue in a magistrate judge's report and recommendation at any time. *Id.* If a party files an objection to the magistrate judge's report and recommendation, the district court must review the objected portions de novo. 28 U.S.C. § 636(b)(1). In the absence of an objection, the district court is not required "to give any more consideration to the magistrate [judge]'s report than the court considers appropriate." *Thomas*, 474 U.S. at 150.

## III.    FACTUAL BACKGROUND

After reviewing the record, the Court finds Judge Roberts accurately and thoroughly set forth the relevant facts in the R&R. The Court adopts Judge Roberts' summary of the facts here.

### A.    *Traffic Stop*

On February 23, 2023, Cedar Rapids Police Officer Matthew Jenatscheck came on duty at 4:00 p.m. and was informed of an ongoing investigation involving Defendant. (Jenatscheck Hr'g Test. at 3.) Specifically, Officer Jenatscheck was informed that narcotics investigators had been surveilling Defendant since earlier in the day for a possible drug transaction. (*Id.* at 12.) At around 7:30 p.m., Officer Jenatscheck was in an unmarked patrol car off 51st Street and Council Street in Cedar Rapids. He had been asked to be in that area and knew that other law enforcement officers had followed Defendant to the Marcus Theatres parking lot off

2

Council Street. Officer Jenatscheck heard over the radio that another vehicle had pulled into the Marcus Theatres parking lot and officers observed an individual exit the vehicle with a bag, take it to Defendant's vehicle, and place it in the back seat. (*Id.* at 3-4.)

After Defendant left the theatre parking lot, Officer Jenatscheck followed Defendant onto Interstate 380. While traveling southbound through the I-380 "S" curves, Officer Jenatscheck observed Defendant's vehicle veer to the right and hit the white outermost fog line multiple times. (*Id.* at 4.) Specifically, Officer Jenatscheck observed Defendant touch the white fog line on two occasions and hit the fog line on a third occasion. (*Id.* at 14.) Because Officer Jenatscheck observed Defendant hit or touch the white fog line three times, he conducted a traffic stop on Defendant for safety concerns and to determine whether Defendant was impaired. (*Id.* at 4.) Officer Jenatscheck also noted that, when he turned on his lights, Defendant made a quick move to the next lane without using his turn signal, which was another traffic violation. (*Id.* at 5.) Additionally, Officer Jenatscheck testified that another reason he pulled Defendant over had to do with the ongoing narcotics investigation and the possible drug transaction that occurred in the Marcus Theatres parking lot. (*Id.* at 6.)

Defendant exited I-380, turned right onto 33rd Avenue SW, and pulled into a gas station. (Gov. Exhibit 3 at 2:57-3:55.) Officer Jenatscheck exited his patrol car and went to the driver's window of Defendant's vehicle. Defendant handed Officer Jenatscheck his license and Officer Jenatscheck testified that there were no signs of intoxication or impairment (*Id.* at 4:00-4:20; Jenatscheck Hr'g Test. at 5, 15.)

Cedar Rapids Police Officer Cody Vry, a canine officer, was also on the scene for the entirety of the stop. (Jenatscheck Hr'g Test. at 6.) At least two additional officers were also on the scene. Officer Vry led his dog around Defendant's vehicle for an open-air sniff and the dog alerted on the vehicle for drugs. (*Id.* at 6-7.) Officer Jenatscheck testified that the dog sniff occurred before he had completed the traffic stop, noting that on the dashboard camera video, while the dog is conducting the sniff "you can hear a beep, and you can hear me radioing to dispatch [Defendant's] driver's license number to verify if he had a valid license." (*Id.* at 11; Gov. Exhibit 3 at 6:35-6:40.)

Based on the dog's positive alert, officers searched the vehicle. In the front seat of the vehicle, officers found a handgun that Defendant advised was in the vehicle and that he had a permit to carry it. Officers also found a large blue duffle bag in the back seat which contained multiple

3

packages believed to be narcotics. One of the packages from the bag was opened and field tested positive for methamphetamine. (Jenatscheck Hr'g Test. at 7.)

On February 23, 2023, Officer Vry, the canine officer on the scene at the traffic stop, testified that he was also aware of the narcotics investigation involving Defendant, including the observations of other officers in the Marcus Theatres parking lot. (Vry Hr'g Test. at 19.) Officer Vry stated that he "knew there was a potential for narcotics being involved in [Defendant's] vehicle." (*Id.*) When Officer Jenatscheck stopped Defendant, Officer Vry was immediately on the scene as he had been following Officer Jenatscheck. After Defendant was removed from the vehicle, Officer Vry ran the dog around Defendant's vehicle and the dog alerted on Defendant's vehicle at the B pillar on the driver's side. Officer Vry's dog is trained to detect heroin, methamphetamine, cocaine, and marijuana. (*Id.* at 20-21.)

### B.    *Narcotics Investigation*

On February 16, 2023, Cedar Rapids police officers conducted a traffic stop on an individual who was found with 1.5 pounds of methamphetamine. Cedar Rapids Police Investigator Mitchell Magill interviewed the individual who agreed to cooperate as a confidential informant ("CI") in the hopes of reducing or avoiding charges related to the methamphetamine seized in the traffic stop. Investigator Magill testified that he was unaware of any concerns with the CI's behavior during the narcotics investigation involving Defendant. (Magill Hr'g Test. at 28-29.)

The CI informed Investigator Magill that Defendant was the CI's methamphetamine source. On February 23, 2023, in the early morning, the CI called Investigator Magill and told him that Defendant had received a "load" of drugs and the CI was supposed help Defendant package the narcotics. The CI stayed in contact with Investigator Magill. The CI went to Defendant's house and relayed to Investigator Magill that Defendant had not yet received the drugs. (*Id.* at 30-31.)

At 9:00 a.m., on February 23, 2023, Investigator Magill began surveillance on Defendant's residence. At approximately 1:30 p.m., a vehicle arrived at Defendant's residence. The vehicle had three occupants, two males and a female. Both males went into Defendant's house for approximately nine minutes and then all three occupants left in the vehicle. Later, Defendant and his girlfriend left the residence and drove to 18th Street in Cedar Rapids where he had a short meeting with a male at the car.

4

Investigator Magill testified that he believed he observed a drug transaction between Defendant and the male. (*Id.* at 31-33.)

At approximately 2:23 p.m., law enforcement conducted a traffic stop of Defendant's vehicle. Officers observed a handgun on Defendant's person and found two MDMA pills and approximately 8 grams of methamphetamine. Defendant and his girlfriend were allowed to leave, and officers did not seize the firearm. They returned to Defendant's residence. (*Id.* at 33-34.) Later, they again left the residence and drove to the Save A Lot parking lot. Defendant's girlfriend went into the Save A Lot. While Defendant's girlfriend was in the Save A Lot, another woman exited a SUV parked next to Defendant's vehicle and sat in the passenger seat of Defendant's car for a short time. Investigator Magill testified that the actions of the woman in Defendant's passenger seat were consistent with narcotics activity. (*Id.* at 32-33.) When Defendant's girlfriend returned to the car from the Save A Lot, they left the parking lot and drove back to 18th Street, where Investigator Magill observed what he believed was another drug transaction. (*Id.* at 33, 35.) From 18th Street, Defendant and his girlfriend returned to Defendant's residence for a time before leaving again for Crestridge Apartments on Edgewood Road. At the Crestridge Apartments, Defendant's girlfriend exited Defendant's vehicle and entered another vehicle. After dropping off his girlfriend, Defendant drove to the Marcus Theatres. (*Id.* at 36.)

Defendant parked in the Marcus Theatres parking lot and waited for about 20 minutes before a van arrived and parked next to his vehicle. Law enforcement observed a male exit the van. The male walked over to the rear driver's side door of Defendant's vehicle and placed a bag in the back seat. Based on his knowledge and experience, Investigator Magill suspected that a drug transaction had occurred, and Defendant had received the delivery of a load of narcotics the CI had alerted him to earlier in the morning. (*Id.* at 36-37.) Investigator Magill testified that he believed there was both probable cause and reasonable suspicion to believe there were drugs located in Defendant's vehicle and that Defendant had engaged in drug trafficking throughout the day on February 23, 2023. (*Id.* at 40-41.)

On February 23, 2023, prior to the traffic stop, Cedar Rapids Police Investigator Matthew Cummings was involved in surveillance of Defendant and specifically observed what he considered to be a drug transaction at the Save A Lot. (*Id.* at 49.)

Following the traffic stop, Defendant was transported to the Cedar Rapids Police Department. At the police station, at approximately 8:30

5

p.m. (Investigator Cummings estimated about 30-60 minutes after the traffic stop), Investigator Cummings and Iowa Department of Narcotics Enforcement Special Agent Lupkes interviewed Defendant. Both Investigator Cummings and Special Agent Lupkes were dressed in plain clothes. Defendant was Mirandized by Investigator Cummings prior to questioning. The interview took place in an interview room at the Cedar Rapids Police Department. The interview room was locked, and Defendant was not free to leave. Defendant was not handcuffed in the interview room. Defendant admitted going to the Marcus Theatres parking lot to pick up the package. Defendant explained that someone would call him and give him a location to pick up a package, he would hold onto the package until receiving another phone call with a location to meet another person and drop the package off. Defendant admitted that he had done this on four other occasions beginning in December 2022. Defendant denied knowing the exact contents of the packages but agreed that they likely contained weapons or drugs. Defendant was released from the police station, but only after a search warrant for Defendant's residence had been completed. Prior to the search being completed, Defendant was not free to leave. (*Id.* at 49-51, 63-66.)

As part of the traffic stop, two cell phones were seized from Defendant. Defendant confirmed the phones belonged to him and a search warrant was obtained to examine their contents. Investigator Cummings testified that the communications on both phones were consistent with narcotics trafficking. Specifically, the communications involved meeting times which matched up with law enforcement's observations during surveillance of Defendant on February 23, 2023. A sample of urine was also obtained from Defendant. The urine sample was sent to a laboratory and returned positive for the use of methamphetamine, MDMA, cocaine, and THC. (*Id.* at 51-53.) Investigator Cummings testified that, based on the observations of law enforcement at the Marcus Theatres parking lot, he believed there was both probable cause and reasonable suspicion that there were drugs in Defendant's vehicle. (*Id.* at 55.)

(Doc. 30, at 4-10).

## IV.   ANALYSIS

In the Motion to Suppress, defendant argues the Court should suppress as fruit of the poisonous tree the items recovered from defendant's person, those obtained from defendant's vehicle, and any admissions made against defendant's interest after the February 23, 2023 traffic stop. (Doc. 19). In addition, defendant asserts the Court must also suppress any evidence obtained as a result of the search warrant for 266 24th Avenue Southwest and evidence obtained from the search warrant on the cellular phones removed from defendant's person. (*Id.*).[1]

In his R&R, Judge Roberts recommended the Court deny defendant's motion. (Doc. 30). Judge Roberts found the evidence supported that Officer Jenatscheck had probable cause to perform a stop because (1) defendant failed to remain as nearly as practical within his lane several times over a short time period, despite no obstacle or weather condition; and (2) defendant failed to use his turn signal at a time it was required. (*Id.*, at 17-26). Judge Roberts also found the evidence supported that the stop was not unconstitutionally prolonged because the dog sniff occurred when the original interaction and records check were still ongoing and did not lengthen the stop. (*Id.*, at 26-28). Judge Roberts next found the evidence showed Officers Jenatscheck and Vry had probable cause and reasonable suspicion to perform the traffic stop based on reasonable belief, consistent with information from a confidential informant and officer surveillance, that illicit drugs were in defendant's vehicle.[2] (*Id.*, at 28-32). As to defendant's statements to officers,

---

[1] Although Judge Roberts' R&R does not specifically address evidence obtained from the search of cellular phones, it follows from his finding that the government did not violate the Constitution in stopping and searching defendant that the contents of the cellular phones are not fruits of the poisonous tree subject to suppression. In adopting Judge Roberts' R&R, the Court thus finds the contents of the cellular phones are admissible.

[2] Judge Roberts also found that to the extent defendant asserts it is problematic that neither officer detailed the narcotics investigation in his respective report, such concern is misplaced; even if

Judge Roberts found the stop was the but-for cause of the statements, but these statements were sufficiently attenuated and thus not subject to suppression even if the stop were unconstitutional. (*Id.*, at 33-36). Last, Judge Roberts found the evidence shows the search warrant for defendant's home is valid and would be valid even were the traffic stop unconstitutional because (1) officers could have acquired the same search warrant without the information from the traffic stop, and (2) reliance on the warrant was objectively reasonable under the good faith exception. (*Id.*, at 36-40).

Neither party objected to any factual or legal findings within the R&R.

### A. *Investigative Stop: Traffic Violations*

Neither party objected to Judge Roberts' legal conclusion that Officer Jenatscheck had probable cause and reasonable suspicion to initiate a traffic stop based on the foregoing traffic violations. (Doc. 30, at 25–26). The Court has done its own research and examination of this matter and agrees with Judge Roberts' findings and conclusions.

A traffic stop constitutes a seizure for purposes of the Fourth Amendment, and therefore must be supported by probable cause or reasonable, articulable suspicion that criminal activity has occurred or is occurring. *United States v. Cox*, 992 F.3d 706, 709 (8th Cir. 2021). "Reasonable suspicion is a less demanding standard than probable cause[.]" *Alabama v. White*, 496 U.S. 325, 330 (1990).

Probable cause is present when "there is a fair probability that contraband or evidence of a crime will be found in a particular place." *United States v. Shackleford*, 830 F.3d 751, 753 (8th Cir. 2016) (cleaned up). "A[n] officer has probable cause . . . when the facts available to him would warrant a person of reasonable caution in the belief that contraband or evidence of a crime is present." *Florida v. Harris*, 568 U.S. 237, 243 (2012) (cleaned up). "[T]he mere probability or substantial chance of criminal activity,

---

this were a problem, collective knowledge doctrine would still provide probable cause and reasonable suspicion. (Doc. 30, at 31-32).

rather than an actual showing of criminal activity, is all that is required." *United States v. Winarseke*, 715 F.3d 1063, 1067 (8th Cir. 2013) (internal citation and quotations omitted).

In contrast, reasonable suspicion requires that an officer be "aware of particularized, objective facts which, taken together with rational inferences from those facts, reasonably warrant suspicion that a crime is being committed." *Hollins*, 685 F.3d at 705 (citation and internal quotation marks omitted). Whether under the probable-cause standard or reasonable-suspicion standard, an officer's subjective intentions play no part in the analysis. *Whren v. United States*, 517 U.S. 806, 813 (1996).

When an officer has lawfully stopped a vehicle, the officer may "search the vehicle without a warrant if the officer has probable cause" to search the vehicle under what is called the "automobile exception" to the Fourth Amendment warrant requirement. *United States v. Mayo*, 627 F.3d 709, 713–14 (8th Cir. 2010). "The automobile exception may apply even when there is little to no chance that the vehicle will be moved or its contents destroyed." *United States v. Soderman*, 983 F.3d 369, 376 (8th Cir. 2020) (further citation omitted).

Officer Jenatscheck observed defendant's vehicle "veer" and hit the fog line multiple times, and he observed defendant move to the next lane without signaling when Officer Jenatscheck turned on his emergency lights. (Docs. 30, at 25 & 23-1, at 4). Based on the totality of the circumstances, an objectively reasonable police officer could have formed probable cause and reasonable suspicion based on defendant's code violations.

Thus, the Court finds probable cause and reasonable suspicion existed based on defendant's traffic violations.

### B. *Investigative Stop: Prolongment*

Neither party objected to Judge Roberts' legal conclusion that the traffic stop was not unconstitutionally prolonged when Officer Jenatscheck checked records on defendant's identification or when Officer Vry's canine performed a dog sniff. The Court has done its own research and examination of this matter and agrees with Judge Roberts' findings and conclusions. When a defendant is detained due to a traffic stop "the officer does not need reasonable suspicion to continue the detention until the purpose of the traffic stop has been completed." *United States v. Ovando-Garzo*, 752 F.3d 1161, 1163 (8th Cir. 2014) (quoting *United States v. Bueno*, 443 F.3d 1017, 1025 (8th Cir. 2006)). An officer may complete tasks that are associated with a traffic stop, but once those tasks are finished the purpose of the stop is also complete. *United States v. Fuehrer*, 844 F.3d 767, 772–73 (8th Cir. 2016). An officer can lawfully conduct a dog sniff during a stop as well, "as long as the traffic stop is not extended in order [to do so]." *Id.* at 773.

Here, Officer Vry was "immediately on the scene when [d]efendant was pulled over." (Doc. 30, at 27). When Officer Vry and his canine were performing the free air dog sniff, Officer Jenatscheck was verifying whether defendant had a valid license through dispatching defendant's driver's license number. (*Id.*). Officer Jenatscheck's actions of verifying that defendant had a valid license is a task associated with a traffic stop and therefore did not unconstitutionally prolong the traffic stop. *See United States v. Quintero-Felix*, 714 F.3d 563, 567 (8th Cir. 2013). Officer Vry's performance of a free air dog sniff also did not unconstitutionally prolong the traffic stop. *See Fuehrer*, 844 F.3d at 773.

Thus, the Court adopts this conclusion and finds that the traffic stop of defendant was not unconstitutionally prolonged.

### C. *Probable Cause and Reasonable Suspicion Based on Drug Trafficking Activities*

Defendant asserts there was no probable cause or reasonable suspicion to conduct an investigatory stop on defendant's vehicle based on alleged drug trafficking activities. (Doc. 19-1, at 8). Specifically, defendant argues that the singular purpose or mission of the traffic stop was to determine whether defendant was under the influence, intoxicated, or impaired. (*Id.*).

Defendant's argument is unavailing. For the reasons previously stated, Officer Jenatscheck had probable cause and reasonable suspicion to initiate a traffic stop based on traffic violations. Even if the Court found no probable cause or reasonable suspicion to initiate a traffic stop based on traffic violations, the Court would still find probable cause and reasonable suspicion to conduct an investigatory *Terry* stop based on defendant's drug trafficking activities.

Judge Roberts found, and the Court agrees that:

> Based on the totality of the circumstances . . . law enforcement had probable cause and reasonable suspicion to conduct an investigatory *Terry* stop consistent with [*United States v. Navarrete-Barron*, 192 F.3d 786 (8th Cir. 1999)]. *See also United States v. Bustos-Torres*, 396 F.3d 935, 942 (8th Cir. 2005) (finding an investigative *Terry* stop constitutional and justified when an officer observed behavior consistent with a drug transaction in an area known to law enforcement to be a common place for drug dealing); *United States v. Williams*, 139 F.3d 628, 630 (8th Cir. 1998) (finding an investigative *Terry* stop constitutional and justified when an officer observed an individual suspected of drug trafficking in the past engaging in behavior consistent with an illegal drug transaction outside a tavern).

(Doc. 30, at 30-31).[3]

---

[3] Neither defendant nor the government objected to Judge Roberts' factual findings in his R&R. As such, the Court adopts Judge Roberts' factual findings as stated in the R&R.

On February 23, 2023, before the traffic stop, a CI informed law enforcement officers that defendant had or would soon receive a supply of drugs that the CI was supposed to help package. (*Id.*, at 29). Officer Jenatscheck was informed that narcotics investigators had been surveilling defendant since earlier in the day. (*Id.*, at 4). Later that day, law enforcement officers followed defendant to the Marcus Theatres parking lot off Council Street. (*Id.*). Officer Jenatscheck heard over the radio that another vehicle had pulled into the Marcus Theatres parking lot and that officers observed an individual exit the vehicle carrying a bag and place the bag in the back seat of defendant's vehicle. (*Id.*).

In the totality, the information the CI provided to law enforcement officers and the officers' observations of defendant on February 23, 2023, would indicate to a reasonable officer that there was a fair probability that additional contraband or evidence of a crime, namely narcotics, would be found in defendant's vehicle. Defendant complains that neither Officer Jenatscheck nor Officer Vry included information in their reports regarding the drug trafficking activity; but the collective knowledge doctrine applies to whether Officers Jenatscheck and Vry had probable cause and reasonable suspicion to conduct an investigatory *Terry* stop. "[P]robable cause may be based on the collective knowledge of all law enforcement officers involved in an investigation and need not be based solely upon the information within the knowledge of the officer on the scene if there is some degree of communication." *United States v. Edwards*, 891 F.3d 708, 711-12 (8th Cir. 2018) (quoting *United States v. Horne*, 4 F.3d 579, 585 (8th Cir. 1993)). It is evident from the record these officers were involved in ongoing communications to update one another on defendant's location and activities. (Doc. 30, at 29-32). Officer Jenatscheck, Officer Vry, Investigator Magill, and Investigator Cummings each testified they knew about the ongoing drug investigation involving defendant and believed there was probable cause and reasonable suspicion to believe there were drugs located in

12

defendant's vehicle.  (*Id.*, at 30).  The Court finds the information communicated to Officers Jenatscheck and Vry regarding the ongoing drug investigation involving defendant gave them probable cause and reasonable suspicion that justified the *Terry* stop and search of defendant's vehicle.[4]

### D.     *Attenuation of Defendant's Statements*

Although Judge Roberts found the traffic stop constitutional, Judge Roberts still analyzed whether defendant's statements following the stop at the police station must be suppressed.  (Doc. 30, at 32-36).  For the reasons previously stated, the Court agrees that the traffic stop was constitutional.  The Court also agrees with Judge Roberts that, even if the traffic stop was unconstitutional, defendant's statements following the stop at the police station should not be suppressed because they are attenuated from the original alleged constitutional violation.

As Judge Roberts noted, there are two issues that must be addressed.  First, whether there was a sufficient factual nexus between the alleged constitutional violation and the challenged evidence.  "Evidence should only be [suppressed] if the 'illegality is at least a but-for cause of obtaining evidence.'"  *United States v. Riesselman*, 646 F.3d 1072, 1079 (8th Cir. 2011) (quoting *United States v. Olivera-Mendez*, 484 F.3d 505, 511 (8th Cir. 2007).  Second, "whether the attenuation doctrine applies."  *United States v. Yorgensen*, 845 F.3d 908, 914 (8th Cir. 2017); *see Utah v. Strieff*, 579 U.S. 232, 238 ("Evidence is admissible when the connection between constitutional police conduct and the evidence is remote or has been interrupted by some intervening circumstance . . . .") (applying the attenuation doctrine).  "To determine whether statements provided are voluntary to purge the taint of the illegal search, [the Court] must consider the giving of

---

[4] Because the officers had probable cause and reasonable suspicion both to stop defendant and search his vehicle based on the drug information, the search and seizure are not tainted.  Absent such taint, the items seized in the search are not poisoned fruits.

13

*Miranda* warnings, the 'temporal proximity' of the illegal search and the statements made, the 'presence of intervening circumstances,' and 'the purpose and flagrancy of the official misconduct.'" *Riesselman*, 646 F.3d 1072 at 1080 (quoting *United States v. Lakoskey*, 462 F.3d 965, 975 (8th Cir. 2006)).

The traffic stop is the alleged constitutional violation. Defendant's statements following the stop at the police station is the challenged evidence. First, the Court agrees with Judge Roberts that but for Officer Jenatscheck initiating the traffic stop, defendant would not have been in a position to speak with Investigator Cummings and Special Agent Lupkes at the police station. Thus, there is a sufficient factual nexus between the alleged constitutional violation and the challenged evidence. Second, the Court agrees with Judge Roberts that the attenuation doctrine applies.[5] As Judge Roberts stated, Investigator Cummings *Mirandized* defendant prior to the interview at the police station. (Doc. 30, at 34). Also, approximately 30 to 60 minutes passed between the traffic stop and defendant's statements at the police station. (*Id.*, at 35). After the traffic stop and before the interview at the police station, there were intervening circumstances because there was a change of location, and investigators who were not directly involved in the traffic stop interviewed defendant. (*Id.*, at 35-36). Finally, the Court has found that Officer Jenatscheck had probable cause and reasonable suspicion to initiate a traffic stop and search defendant's vehicle based on both traffic violations and collective knowledge of drug trafficking activities. Thus, Officer Jenatscheck acted within his duties and did not engage in flagrant nor official misconduct. Having undertaken its own review, the Court agrees with Judge Roberts that defendant's statements made at the police station after the

---

[5] As Judge Roberts noted in his R&R, defendant and the government focus their arguments solely on the statements made at the police station after the traffic stop. (Doc. 30, at 34 n. 11). Thus, the Court's analysis is likewise limited to the statements made at the police station after the traffic stop.

traffic stop were sufficiently attenuated and thus not subject to suppression even if the stop was unconstitutional.

### E. Search Warrant for Defendant's Residence

Last, Judge Roberts concluded that (1) law enforcement officers could have acquired the same search warrant of defendant's residence without the information from the traffic stop, and (2) reliance on the warrant was objectively reasonable under the good faith exception. (*Id.*, at 36-41).

> The Court agrees with Judge Roberts. As Judge Roberts stated,
>
> [r]emoving the items seized during the traffic stop, in particular the bag of methamphetamine, the search warrant application provided the following information: (1) Defendant was identified by a CI as a source for methamphetamine, cocaine, and ecstasy in Cedar Rapids; (2) the CI identified Defendant's residence and informed law enforcement that the residence contained numerous guns, multiple safes, and narcotics; (3) on February 23, 2023, the CI informed Investigator Magill that Defendant would be receiving approximately 25 pounds of methamphetamine that day; (4) while surveilling Defendant, law enforcement observed Defendant leave his residence and drive to 18th Street in Cedar Rapids and engage in what appeared to be a drug transaction; (5) following the apparent drug transaction, law enforcement conducted a traffic stop (not the stop Defendant is trying to suppress in the instant motion, which occurred late on February 23, 2023) and found two MDMA pills and 8.7 grams of methamphetamine (Defendant was released after this stop); (6) Defendant returned to his residence and later left again where law enforcement observed drug transactions at a Save A Lot and on 18th Street; (7) law enforcement observed Defendant at the Marcus Theatres parking lot, where an individual exited a van and placed a bag in the back seat of Defendant's vehicle; and (8) Defendant's criminal history included previous drug related convictions. (Gov. Exhibit 1 at 10-11.)

(*Id.*, at 38-39).[6] Based on the evidence above, the Court agrees that law enforcement officers could have acquired the same search warrant of defendant's residence without the information from the traffic stop and had probable cause to do so. *See United States v. Swope*, 542 F.3d 609, 615-17 (8th Cir. 2008) (finding that a redacted search warrant application supported probable cause based on both circumstantial evidence and inferences).

The *Leon* good faith exception protects evidence obtained as the result of officers' "objectively reasonable reliance on a subsequently invalidated search warrant[.]" *United States v. Leon*, 468 U.S. 897, 922 (1984). As Judge Roberts discussed, there are four scenarios when an officer's reliance on a warrant would not be objectively reasonable, none of which are applicable here:

> (1) when the affidavit or testimony supporting the warrant contained a false statement made knowingly and intentionally or with reckless disregard for its truth, thus misleading the issuing judge; (2) when the issuing judge "wholly abandoned his judicial role" in issuing the warrant; (3) when the affidavit in support of the warrant is "so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable"; and (4) when the warrant is "so facially deficient" that no police officer could reasonably presume the warrant to be valid.

*United States v. Proell*, 485 F.3d 427, 431 (8th Cir. 2007) (citing *Leon*, 468 U.S. at 923). Ultimately, Judge Roberts concluded that the officers' conduct was "close enough to the line of validity" and therefore was reasonable:

> [f]or the *Leon* exception to apply when the warrant is based on evidence obtained through a Fourth Amendment violation, the detectives' prewarrant conduct must have been 'close enough to the line of validity to make the officers' belief in the validity of the warrant objectively reasonable.'

---

[6] As stated previously, neither defendant nor the government objected to Judge Roberts' factual findings in the R&R. As such, the Court adopts Judge Roberts' factual findings as stated in the R&R.

16

Case 1:23-cr-00025-CJW-MAR   Document 33   Filed 11/16/23   Page 16 of 17

*States v. Cannon*, 703 F.3d 407, 413 (8th Cir. 2013) (quoting *United States v. Conner*, 127 F.3d 663, 667 (8th Cir. 1997)). Defendant urges that the *Leon* good faith exception cannot apply because "[i]f the officers' prewarrant conduct is 'clearly illegal,' the good-faith exception does not apply." *Cannon*, 703 F.3d at 413 (quoting *Conner*, 127 F.3d at 667). Here, the officers' actions were not "clearly illegal." Again, law enforcement officers had probable cause to conduct the traffic stop. The Court, therefore, agrees with Judge Roberts' conclusion that the officers' conduct was not "clearly illegal" and did not stray from "the line of validity[.]"

### V. CONCLUSION

For the reasons stated above, the Court **adopts** Judge Roberts' R&R, (Doc. 30) and **denies** defendant's Motion to Suppress (Doc. 19).

**IT IS SO ORDERED** this 16th day of November, 2023.

_____
C.J. Williams
United States District Judge
Northern District of Iowa